IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KONINKLIJKE PHILIPS N.V., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 20-1708 (CFC) |
| | ) | |
| TELIT WIRELESS SOLUTIONS, INC. and TELIT COMMUNICATIONS PLC, | ) ) | |
| | ) | |
| Defendants. | ) | |
| KONINKLIJKE PHILIPS N.V., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 20-1711 (CFC) |
| | ) | |
| TELIT WIRELESS SOLUTIONS, INC., TELIT COMMUNICATIONS PLC and CALAMP CORP., | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**TELIT WIRELESS SOLUTIONS, INC'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION TO PREVENT PHILIPS FROM LITIGATING IN THE INTERNATIONAL TRADE COMMISSION**

OF COUNSEL:

David Loewenstein
Clyde Shuman
PEARL COHEN ZEDEK LATZER
  BARATZ LLP
1500 Broadway, Suite 12
New York, NY  10036
(656) 878-0800

February 15, 2021

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
araucci@morrisnichols.com
*Attorneys for Defendant Telit Wireless Solutions, Inc.*

<u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      NATURE AND STAGE OF THE PROCEEDINGS…………………………………1

II.     SUMMARY OF ARGUMENT ……………………………………………………4

III.    STATEMENT OF FACTS…………………………………………………………5

        A.      The Parties ..................................................................................................... 5

                1.      Telit ................................................................................................... 5

                2.      Philips................................................................................................. 5

        B.      SEP/FRAND Patents ..................................................................................... 6

        C.      Telit's and Philips' License Negotiations..................................................... 7

IV.     ARGUMENT…………………………………………………………………….. 8

        A.      Phillips Has Breached its ETSI Agreement Under French Law.................. 8

        B.      The Court Should Enjoin Philips From Seeking an Injunction in the ITC................ 11

                1.      Telit Is Likely to Succeed on the Merits ......................................... 16

                2.      Telit Will be Irreparably Harmed by Being Forced to Litigate in Two Fora
                        Simultaneously................................................................................. 17

                3.      Balance of Hardships ....................................................................... 18

                4.      The Public Interest Favors Preventing Philips from Litigating in the ITC ...... 18

        C.      The Third Circuit Test Also Supports an Anti-Suit Injunction .................. 19

                1.      Philips' Threat of Injunctive Relief in the ITC Adversely Impacts Important
                        Public Policy Considerations ........................................................... 20

                2.      ITC Exclusion Orders Would Effectively Divest this Court of Jurisdiction
                        Over the FRAND Determination ...................................................... 21

V.      CONCLUSION……………………………………………………………………22

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014) ................................................................... *passim*

*Apple, Inc. v. Motorola Mobility, Inc.*,
886 F.Supp.2d 1061 (W.D. Wa. 2012) .................................................9

*BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Research Org.*,
2019 U.S. Dist. LEXIS 228305 (E.D. Va. 2019) ...........................................12, 24

*Comcast Corp. v. Rovi Corp.*,
2016 U.S. Dist. LEXIS 173282 (S.D.N.Y. 2016). .............................................18

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006)........................................................................11, 12

*Ericsson Inc. v. Samsung Elecs. Co.*,
2021 U.S. Dist. LEXIS 4392 (E.D. Tex. 2021),............................................16, 17

*Foster v. Am. Mach. & Foundry*,
492 F.2d 1317 (2d Cir. 1974) .............................................................12

*General Electric Co. v. Deutz AG*,
270 F.3d 144 (3d Cir. 2001) ................................................. 22, 23, 25

*General Protecht Grp., Inc. v. Leviton Mfg. Co.*,
651 F.3d 1355 (Fed. Cir. 2011) ...........................................................17

*Huawei Tech. Co. v. Samsung Elec. Co.*,
2018 WL 1794065 (N.D. Cal. 2018) ....................................................26

*Huawei Tech. Co. v. Samsung Elec. Co.*,
2019 U.S. App. LEXIS 7649 (Fed. Cir. 2019).....................................26

*M/S Bremen v. Zapata*,
407 U.S. 1 (1972).........................................................................21

*Microsoft Corp. v. Motorola, Inc.*,
2013 U.S. Dist. LEXIS 60233 (W.D. Wash. 2013).............................................10

*Microsoft Corp. v. Motorola, Inc.*,
  696 F.3d 872 (9th Cir. 2012) ............................................................... 9, 13, 21, 26

*Microsoft Corp. v. Motorola, Inc.*,
  871 F. Supp. 2d 1089 (W. D. Wash. 2012) ................................................. *passim*

*Realtek Semiconductor Corp. v. LSI Corp.,*
  946 F. Supp. 2d 998 (N.D. Cal. 2013)................................................................15

*Stonington Partners v. Lernout & Hauspie Speech Prods. N.V.*,
  310 F.3d 118 (3d Cir. 2002) ........................................................................18, 23

*TQ Delta, LLC v. ZyXEL Communs. Inc.*,
  No. 1:13-cv-02013-RGA , 2018 U.S. Dist. LEXIS 98228 (D. Del., June 12,
  2018) ..........................................................................................................24, 25

## **Rules**

Fed. R. Civ. P. 65 .................................................................................22, 23

## I.     NATURE AND STAGE OF THE PROCEEDINGS

On December 17, 2020, Plaintiff Koninklijke Philips N.V. ("Philips") filed two patent cases in this Court against Telit Wireless Solutions, Inc. ("Telit") and Telit Communication PLC ("Telit UK"). In 20-1708, Philips alleged Telit cellular communications modules infringed six patents.  In 20-1711, it asserted the same modules infringed four other patents[1].   On the same day, Philips initiated a proceeding in the International Trade Commission ("ITC") against Telit and others on the four 20-1711 patents, but not on the six 20-1708 patents. (ITC Complaint annexed as Ex. 1).

Philips alleges in both cases in this Court that the asserted patents are standard essential patents ("SEPs"). Philips has agreed, and is obligated, to license those patents at a fair, reasonable and non-discriminatory ("FRAND") rate. (20-1711 Complaint, D.I.1 ¶188).   Philips admits *it must license* these patents.   Philips' Complaints request a declaratory judgment barring Telit from "rais[ing] any claim seeking a determination of the FRAND rates… or rais[ing] any other FRAND claims in this or any other court world-wide…" (i.e., an anti-suit injunction).  (20-1711, D.I.1, ¶191 and Prayer for Relief (g), 20-1708, D.I.1 ¶¶217-19 and Prayer for Relief

---

[1]     In the 1711 action, Philips also joined CalAmp Corp. (a customer) as a defendant. The same day, Philips filed other actions on the same patents against other defendants in C.A. Nos. 20-1707, 1709, 1710, and 1713.

(g)).  Alternatively, Philips said if Telit submits "sworn affidavits stating that they would sign a license to Philips' world-wide… patents," then:

> Philips is entitled to a declaratory judgment determining the appropriate world-wide FRAND licensing terms for Philips' world-wide portfolio of patents under ETSI policies.

20-1711, D.I.1, ¶193 and Prayer for Relief (g).

The ITC instituted an investigation on January 19, 2021.  However, it cannot award damages such as a FRAND license Philips seeks here.  In the ITC, Philips is seeking injunctive relief (exclusion and cease and desist orders). The relief Philips seeks in the ITC is flatly inconsistent with both its FRAND obligations and its demand for a declaratory judgment seeking FRAND rates here. The hearing in the ITC is set for September 22, 2021, just over seven months from now (hardly conducive to a *fair or reasonable* license negotiation).

Telit does not oppose the Court determining the appropriate FRAND rate (for Philips' worldwide portfolio) in the event liability is established, and believes that should be done expeditiously, but without the threat of an ITC exclusion order hanging over Telit's head.[2]

When Philips filed these actions, the parties were negotiating a FRAND license.  Just three days *after* Philips filed these actions, its in-house Principal

---

[2]    Philips also seeks an injunction in these cases to prevent Telit from selling the accused products. That too is improper, but that is an issue for another day.

Intellectual Property and Licensing Counsel wrote to Telit (Ex. 2; emphasis added throughout brief unless otherwise noted):

> I do not see the filing [i.e., the Complaints] as disabling Philips' efforts to find a mutually acceptable resolution of the use of Philips [sic] patents. As always, ***Philips is willing and committed to continue to negotiate in good faith and it is not uncommon for negotiations <u>to continue</u> even after the filing of a lawsuit as the court actions progresses*** [sic]***.***
>
> ***Philips remain willing to resolve this matter and move towards a short term settlement with Telit.***

Thus, Philips wants the Court to set a FRAND rate and it wants Telit "to *continue*" – ongoing – FRAND license negotiations.  This time, however, Philips also wants Telit knuckle under with the threat of a rapid ITC injunction.

 On January 8, 2021, Telit's counsel wrote to Philips' counsel offering to meet Philips' demand to allow this Court to determine a FRAND rate, provided certain conditions were met, including withdrawing the ITC case. Philips responded on January 29, rejecting Telit's proposal, and offering another, but without agreeing to withdraw the ITC case.

Philips is plainly using the ITC action to pressure Telit to settle. Although it demands that this Court set FRAND license rates, at the same time, it seeks to put Telit out of business with an ITC injunction. As explained below, Philips' actions are illegal and inequitable. Telit, therefore, seeks an injunction barring Philips from proceeding in the ITC.

Indeed, Philips is seeking an anti-suit injunction in both Delaware cases -- and is no position to complain about Telit seeking the same remedy by this motion.

## II.    SUMMARY OF ARGUMENT

The fundamental purpose of FRAND licensing requirements is that technology companies, like Telit, that sell standard-compliant devices, need not look over their shoulders for years, concerned that a patent owner – that allowed them to adopt a technology standard in the first place – will try to shut them down after they have invested substantial resources to sell their products. Yet that is exactly what Philips is trying to do in its ITC action. The ITC, with its extremely broad exclusionary authority, however, is not intended to be a tool to enhance a party's leverage in FRAND licensing negotiations.

Philips has breached its FRAND obligations (which are governed by French law) by seeking injunctive relief from the ITC while simultaneously engaging in license negotiations and requesting a FRAND determination in this Court.

Therefore, as a matter of French, Federal Circuit and Third Circuit law, the Court should enjoin Philips from proceeding in the ITC against Telit.[3]

---

[3]    Telit UK is based in England and does not make or sell any products in the U.S. Telit UK has been dismissed from patent infringement actions twice in decisions by Judge Andrews. We have asked Philips to dismiss its claims against Philips UK, and are awaiting a response. Telit UK will move separately to dismiss the claims against it if necessary.

## III.    STATEMENT OF FACTS

### A.    The Parties

#### 1.    Telit

Telit sells small wireless communications devices called "modules" used in a broad spectrum of different technologies, which Philips alleges Telit has sold for decades. (Ex. 1, ¶35).

Telit has hundreds of customers. (Kelly Dec., ¶4). They include companies that build devices that monitor: patient health (e.g., glucose); criminal offenders (ankle bracelets); the elderly; and security systems (residential and commercial alarms); and "smart" electric meters, to name a few. (Kelly Dec., ¶5). One of Telit's customers builds devices that track COVID vaccine delivery trucks. (*Id.*). If Telit were barred from selling the accused modules, it would drastically effect Telit's revenue and indeed its ability to survive. (Kelly Dec., ¶¶6-7).

#### 2.    Philips

Philips is a huge company with "significant resources" (20-1711, D.I.1, ¶¶12, 18). It is not, however, in the module business. (See *id.*, ¶17 ("Philips stopped manufacturing mobile telecommunications [sic] by around 2006…")). Instead, it sells patent licenses.

Philips told the ITC the closest it comes to a product related to Telit's communication modules is a medical device for sleep apnea that supposedly

incorporates various communications standards, (Ex.1, ¶15; see also Ex.3, ¶¶6-7), allegedly covered by the asserted patents.

Because Philips does not make a competitive product, even if Telit's products were found to infringe, and ultimately were excluded by the ITC, Philips' revenues and profits would not increase. The injunctive relief Philips seeks in the ITC is disproportionate to any potential injury that Philips *might* incur by the alleged infringement. The remedy for that injury (if any exists), which Philips quantified years ago, is a FRAND license.

Philips alleges that it has granted licenses under the asserted patents. (Ex.1, ¶236; Ex.4). This further demonstrates Philips' willingness, and obligation, to grant licenses on FRAND terms, and the exclusionary remedies it seeks in the ITC are unnecessary and improper.

## B.    SEP/FRAND Patents

SEPs provide an enormous societal benefit, allowing interoperability for a very-wide spectrum of consumer and commercial devices.  Without these standards, much of common modern-day life, which we take for granted, would be impossible:

> When we connect to WiFi in a coffee shop, plug a hairdryer into an outlet, or place a phone call, we owe thanks to standard-setting organizations ('SSOs').

*Microsoft Corp. v. Motorola, Inc.,* 795 F.3d 1024, 1030 (9th Cir. 2015).

The asserted patents are governed by European Telecommunications Standards Institute ("ETSI") licensing rules, which are interpreted under French law. (Ex.1 at ¶¶15, 32 and Ex.B at 38, ¶12). Among other things, disputes related to ETSI policy are to be resolved "bilaterally in a friendly manner." (Stoffel-Munck Dec. Ex. B at 60, ¶4.3).  As explained below, Philips has breached its obligations under French law.

### C.    Telit's and Philips' License Negotiations

Before Philips filed its Complaints, it was engaged in comprehensive negotiations with Telit concerning Philips' worldwide patent portfolio, "but Telit and the other defendants have not accepted Philips' offers to license…" (20-1711, D.I.1, ¶¶188, 20, 215; D.I.1, 20-1713, ¶206).[4]  In Philips' view, all other parties acted unreasonably by refusing to accept the rate Philips demanded; but it acted reasonably by offering what it asserts is a FRAND rate.  (20-1711, D.I.1, ¶20 and Complaints in 20-1710, ¶201 and 20-1713, ¶206). But a rate is not FRAND because Philips says so.

Telit and Philips exchanged license offers, but there was a disagreement about the calculation methodology, and the amount.  In November 2020, Telit provided a detailed assessment of Philips' patent portfolio.  Telit applied an accepted analytical

---

[4]    Telit's FRAND discussions with Philips, like all FRAND discussions, never focused on the validity or infringement of any particular asserted patent and should not be considered as an admission of liability by Telit.

methodology, called "top down," which determines among other things, the total number of patents related to the relevant wireless standards, the number of unexpired Philips patents related to the standard, and determined the amount to which Philips would be entitled.

Philips and Telit met in November and exchanged emails related to the FRAND negotiations in December 2020. Telit's email included a comprehensive PowerPoint slide deck setting forth Telit's underlying FRAND methodology and a proposed payment.

On December 17, 2020, two weeks after the last email exchange, Telit was very surprised when Philips filed the three Complaints. Three days later, Philips asked Telit to resume the FRAND license negotiations. The only plausible interpretation of Philips' acts is that it is using the threat of an ITC injunction, and the high cost and speed of ITC litigation, to try to force Telit to accept a licensing rate to which it would not otherwise agree.

## IV.    ARGUMENT

### A.    <u>Phillips Has Breached its ETSI Agreement Under French Law</u>

Prof. Stoffel-Munck, a well-respected French-law professor, and an expert on ETSI requirements, including FRAND licensing obligations, has submitted a declaration that explains Philips has breached its contract with ETSI. (Stoffel-Munck Dec., ¶¶32, 71, 72; see also ¶¶30, 54, 56); see also *Microsoft Corp. v. Motorola, Inc.*,

696 F.3d 872, 884 (Fed. Cir. 2012) (a user of the ETSI standard is a third-party beneficiary); *Apple, Inc. v. Motorola Mobility, Inc.*, 886 F.Supp. 2d 1061, 1085 (W.D. Wa. 2012) (same); 20-1711, D.I. 1, ¶¶187-191 (acknowledging Telit is entitled to FRAND rates).

Under French law, Philips' seeking an injunction is inconsistent with its duty *to grant* a FRAND license because the parties were conducting FRAND license negotiations, Philips has asked Telit "to continue" those negotiations, and has asked the Court to either (a) to bar Telit from litigating the issue anywhere else, or (b) to determine a FRAND rate. (Stoffel-Munck Dec., ¶¶30, 32, 54, 56, 70-72).

In a press release, in a case between Apple and Motorola, the European Commission stated:

> *the seeking of an injunction based on SEP may constitute an abuse of a dominant position* if a SEP holder has given a voluntary commitment to license its SEP on FRAND terms and where the company against which an injunction is sought is willing to enter into a licence agreement on such FRAND terms.

Stoffel-Munck Dec., ¶66.

Further, the Commission found:

> "*that it was abusive for Motorola to both seek and enforce an injunction against Apple* in Germany on the basis of an SEP which it had committed to license on FRAND terms and where Apple had agreed to take a licence and be bound by a determination of the FRAND royalties by the relevant German court.

*Id.*, ¶67.

Courts in this country have reached the same conclusion. Notwithstanding the benefits of these standards, they are ripe for abuse:

> When the standard becomes widely used, the holders of SEP obtain substantial leverage to demand more than the value of their specific patented technology. … After the standard is widely implemented, switching to those alternatives is either no longer viable or would be very costly.
>
> \*\*\*
>
> Such [FRAND] rules help to ensure that standards do not allow essential patent owners to extort their competitors or prevent competitors from entering the marketplace.

*Microsoft Corp. v. Motorola, Inc.*, 2013 U.S. Dist. LEXIS 60233 at \*37 and \*28 (W.D. Wash. 2013), aff'd, *Microsoft*, *supra*, 795 F.3d 1024.

In *Microsoft*, the Ninth Circuit held (at 1030-31):

> The development of standards thereby creates an opportunity for companies to engage in anti-competitive behavior. Most notably, once a standard becomes widely adopted, SEP holders obtain substantial leverage over new product developers, who have little choice but to incorporate SEP technologies into their products. Using that standard-development leverage, the *SEP holders are in a position to demand more for a license than the patented technology, had it not been adopted by the SSO, would be worth*.

**B.    The Court Should Enjoin Philips From Seeking an Injunction in the ITC**

Justice Kennedy's concurring opinion in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 396-97 (2006), recognized the potential to abuse injunctions in patent suits brought by entities, like Philips, that do not make competitive products:

> For these firms, *an injunction, and the potentially serious sanctions arising from its violation, can be employed as a bargaining tool to charge exorbitant fees to companies that seek to buy licenses to practice the patent*. When the patented invention is but a small component of the product the companies seek to produce and *the threat of an injunction is employed simply for undue leverage in negotiations*, legal damages may well be sufficient to compensate for the infringement and *an injunction may not serve the public interest*.

That is precisely what Philips is doing. Its behavior is especially problematic because SEPs are at issue. See also, *BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Research Org.*, 2019 U.S. Dist. LEXIS 228305 at *52 and *54 (E.D. Va. 2019) (Being "'open' to sharing their technology […] counsels against an injunction." *** "While injunctions may, at times, play a role in royalty negotiations, bargaining leverage is neither an appropriate reason to seek an injunction, nor an appropriate reason to grant an injunction.") (citing Justice Kennedy's opinion in *eBay* and *Foster v. Am. Mach. & Foundry*, 492 F.2d 1317, 1324 (2d Cir. 1974) (patentee made no product; an injunction "is not intended as a club to be wielded by a patentee to enhance his negotiating stance.")).

Several U.S. courts have addressed the impropriety of seeking injunctive relief in parallel proceedings based on SEPs. They have held the threat of injunctive relief upsets the balance of negotiating power in the patent owner's favor and some have barred patentees from pursuing patent litigation in a parallel forum. *Microsoft Corp. v. Motorola, Inc.*, 871 F. Supp. 2d 1089, 1103 (W. D. Wash. 2012), aff'd, 696 F.3d 872 (9th Cir. 2012).

In *Microsoft Corp, Inc.*, 696 F.3d at 884-85, the Ninth Circuit affirmed the grant of an injunction barring the patentee from seeking an injunction from a German Court on SEPs subject to a FRAND/RAND license requirement:

> Motorola, in its declarations to the ITU, promised to 'grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to use the patented material necessary' to practice the ITU standards. … ***Implicit in such a sweeping promise is, at least arguably, a guarantee that the patent-holder will not take steps to keep would-be users from using the patented material, such as seeking an injunction, but will instead proffer licenses consistent with the commitment made***.

\*\*\*

> [H]owever the RAND rate is to be determined under the ITU standards, ***injunctive relief against infringement is arguably a remedy inconsistent with the licensing commitment***.

Similarly, in *Apple Inc. v. Motorola, Inc*., 757 F.3d 1286, 1331-32 (Fed. Cir. 2014), the Federal Circuit affirmed summary judgment that the SEP owner was not entitled to an injunction, for reasons similar to those here: (1) the existence of

12

ongoing negotiations, and no evidence that the accused infringer had "unilaterally refus[ed] to agree to a deal;" (2) the existence of licenses "strongly suggest that money damages are adequate;" and (3) "[a] patentee subject to FRAND commitments may have difficulty establishing irreparable harm."

Philips told the ITC it has license**s** under the asserted patents (Ex.1 at pdf 7) ("Cellular communication modules are available from Philips' licensees and other manufacturers. *** "numerous companies exist…"); (*id.* at pdf 8) ("Philips' licensees and other non-Respondents are major vendors …"); (Ex.5 at 2) ("[T]here exist *numerous alternatives* to Respondents' accused products in the market…"). As the Federal Circuit held, that argument undermines Philips' request for an injunction:

> Considering the large number of industry participants that are already using the system claimed in the '898 patent, including competitors, Motorola has not provided any evidence that adding one more user would create such [irreparable] harm.

*Apple*, at 1332.

Philips' assertion that Telit has not accepted a license on Philips' terms (20-1711, D.I.1, e.g., ¶¶20 and 188) apparently is Philips' justification for seeking an injunction. However, the Court in *Apple* stated (at 1332):

> To be clear, this does not mean that an alleged infringer's refusal to accept any license offer necessarily justifies issuing an injunction.

*See also* Stoffel-Munck Dec., ¶26.

13

In *Realtek Semiconductor Corp. v. LSI Corp.*, the Court enjoined patentees from enforcing any exclusion order or injunctive relief from the ITC until the Court determined the parties' FRAND/RAND obligations, stating:

> the act of seeking injunctive relief (here, at the ITC *before* proposing a RAND license to Realtek) is inherently inconsistent and a breach of defendants' promise to license the patents on RAND terms.

946 F. Supp. 2d 998, 1006 (N.D. Cal. 2013) (original emphasis).

Although the patent owner in *Realtek* had not made a license offer, the facts here favor enjoining Philips from seeking an ITC remedy even more strongly: (1) in *Realtek*, the patent owner did not seek to have the Court declare what a FRAND rate should be, as Philips has demanded here (albeit in a contingent pleading); (2) unlike Philips, the patent owner in *Realtek* did not sue in the midst of FRAND negotiations; and then (3) seek to continue those negotiations after filing suit.

Just a month ago, in *Ericsson Inc. v. Samsung Elecs. Co.*, the court addressed the situation where Samsung filed a suit in China seeking to bar Ericsson from, *inter alia*, pursuing FRAND license litigation in any other court worldwide. 2021 U.S. Dist. LEXIS 4392 at * 20 (E.D. Tex. 2021). The Chinese Court then granted a broad anti-suit injunction preventing Ericsson from prosecuting any other action. By that time, however, Ericsson had filed suit in Texas alleging Samsung breached its ETSI obligation to grant FRAND license rates on SEPs. The court granted an anti-

interference injunction against Samsung, *inter alia*, preventing it from taking certain actions in the Chinese Court.

The court characterized as "the height of inequity" the same thing Philips is doing here, attempting to bar Telit from seeking a remedy in any other Court, while allowing itself to seek a remedy in another forum:

> If Samsung can seek redress of its claims through injunctive relief in the United States, it would be the height of inequity (and hypocrisy) to allow the ASI [Chinese anti-suit injunction] to tie Ericsson's hands from doing the same.

*Ericsson* at *20.

Samsung also sued in the ITC. The Court further held (*Ericsson* at *20-*21):

> The issues present before this Court, the Wuhan Court, the United States International Trade Commission, and elsewhere **should be resolved on the merits and not based on unfair economic leverage gained through litigious gamesmanship.** Equity demands no less.

These decisions demonstrate seeking broad exclusionary relief, while simultaneously negotiating and demanding a FRAND rate in court, gives improper leverage in licensing negotiations, violating the patent owner's FRAND obligations.

The Federal Circuit has held that in a case "involving an injunction against participation in a district court suit for patent infringement and an ITC investigation under section 337 of the Tariff Act this court's procedural law applies." *General Protecht Grp., Inc. v. Leviton Mfg. Co.*, 651 F.3d 1355, 1359 (Fed. Cir. 2011);

*Comcast Corp. v. Rovi Corp.*, 2016 U.S. Dist. LEXIS 173282 at *6 (S.D.N.Y. 2016) ("Federal Circuit law governs the issue of whether to grant a preliminary injunction to enjoin Rovi's participation in an ITC…").

The Federal Circuit considers the following factors when determining if a preliminary injunction should issue in an anti-suit injunction context issue: (1) likelihood of success on the merits; (2) irreparable harm to the moving party; (3) balance of hardships; and (4) public interest. *Protecht* at 1359-63. These factors favor an injunction here.

### 1. Telit Is Likely to Succeed on the Merits

Because not all anti-suit injunctions fit nicely into the preliminary injunction formula, some Courts do not require this element. *Microsoft*, 871 F. Supp. 2d at 1102 (In the anti-suit injunction/SEP context, likelihood of success on the merits "has clearly been replaced by the anti-suit injunction factors."[5]); see also, *Stonington,* discussed below).

If liability exists, both Telit and Philips agree that a FRAND determination is appropriate in these actions – so there is no dispute on the "merits." In any case, Telit is likely succeed on a breach of contract claim because Philips has sued for

---

[5]    Those factors are: (1) whether the parties and the issues are the same, and whether the first action is dispositive of the action to be enjoined; (2) whether the foreign litigation would frustrate a policy of the forum issuing the injunction; and (3) whether the impact on comity would be tolerable. *Microsoft* at 1097.

injunctive relief in the midst of FRAND license negotiations violating French law. (Stoffel-Munck Dec., ¶¶70-72).

### 2. Telit Will be Irreparably Harmed by Being Forced to Litigate in Two Fora Simultaneously

In *Protecht,* 651 F.3d at 1363, the Federal Circuit found that being forced to litigate in two fora simultaneously established irreparable harm, citing with approval the District Court's holding: "'litigating simultaneously in California and the ITC will cause financial and business hardship and that the inconvenience and disruption to its business is irreparable.'"

Inevitably, an ITC injunction would cause Telit to lose market share, which Philips argues would happen because of the "numerous alternatives." The difficulty of regaining that lost share, because of an improperly granted injunction, is also evidence of irreparable harm. *Microsoft*, 871 F. Supp. 2d at 1102; Kelly Dec. ¶7. If a FRAND rate is established, however, no injunctive relief is possible. Dissolving the ITC's injunction *after* a FRAND rate is established would be a meaningless exercise because the damage will have been done; it is highly unlikely customers would switch back to Telit. (Kelly Dec., ¶7). That is irreparable harm.

On the other hand, as the Federal Circuit stated in *Apple*, 757 F.3d at 1332:

> A patentee subject to FRAND commitments may have difficulty establishing irreparable harm.

Therefore, this factor supports Telit's request for injunctive relief.

17

### 3.    **Balance of Hardships**

In *Protecht* at 1365, the Federal Circuit stated:

> The district court found that the balance of hardships favored the injunction because GPG would suffer the hardships of litigating on two fronts and being deprived of its bargained-for forum, as discussed above, but Leviton could obtain substantially the same relief in district court as in the ITC.

Here, the hardship of litigating in two fora simultaneously is the same. The ITC cannot award a FRAND license rate. Although there is no forum selection clause at issue here (as in *Protecht*), neither party bargained for (or contemplated) a forum that could issue only one remedy, an injunction. Both sides' expectations were, and are, a FRAND license.

### 4.    **The Public Interest Favors Preventing Philips from Litigating in the ITC**

In *Protecht*, at 1365-66, the Federal Circuit held the existence of a forum selection clause was sufficient to establish the necessary predicate for injunctive relief:

> There is no public interest served by excusing a party's violation of its previously negotiated contractual undertaking to litigate in a particular forum.

Here, there is no "public interest served" in allowing Philips to breach its contract with ETSI.

18

Telit submits, however, a party's FRAND agreement that implicates public policy for a huge portion of the high-tech industry and consumers, is a far more important policy to uphold than an *inter partes* forum selection clause at issue in *Protecht*. In *Microsoft,* 696 F.3d at 884-85 the Court stated: "'[T]here are compelling reasons why a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power . . . should be given full effect.' *M/S Bremen* [*v. Zapata*], 407 U.S. [1] at 12-13 [1972]."

As the Federal Circuit stated in *Apple*, 757 F.3d at 1332, in affirming summary judgment that the SEP owner was not entitled to an injunction:

> [T]he public has an interest in encouraging participation in standard-setting organizations but also in ensuring that SEP are not overvalued.

See also *Microsoft*, 871 F. Supp.2d at 1103 (the public interest is served by an anti-suit injunction "ensuring [SEP] are accessible to all comers…")

## C.    The Third Circuit Test Also Supports an Anti-Suit Injunction

To the extent that Third Circuit law applies, in *General Electric Co. v. Deutz AG*, 270 F.3d 144 (3d Cir. 2001), the Court held that foreign parallel proceedings may be enjoined "to protect jurisdiction or an important public policy." *Id*. at 161:

> In our cases considering anti-suit injunctions, we have not specifically evaluated irreparable injury and other Rule 65 requirements, but instead reached only the threshold requirements unique to anti-suit injunctions, namely comity concerns, which we view as more restrictive than the general requirements of Rule 65. We think that if the

requirements for an anti-suit injunction are met, these supplant the need for proof under Rule 65.

*Stonington Partners v. Lernout & Hauspie Speech Prods. N.V.*, 310 F.3d 118, 129 (3d Cir. 2002); *General Electric*, 270 F.3d at 159 and 162 ("In parallel litigation, the issue of comity is an important and omnipresent. *** Our jurisprudence thus reflects a serious concern for comity.")

Comity, however, is not an issue here.

### 1.    Philips' Threat of Injunctive Relief in the ITC Adversely Impacts Important Public Policy Considerations

Assuming that the asserted patents cover standard essential technology, and are valid, Philips now wants to change the rules of the game long after it started – and to prevent Telit (and others) from using technology that is in tens of millions of wireless communications modules, and tens of millions of devices in the U.S. (and around the world). That behavior is plainly contrary to public policy. *Apple*, 757 F.3d at 1332 (quoted above).

Avoiding inconsistent judgments (e.g., an injunction in the ITC, but one denied in this Court) is another important policy consideration. *Microsoft*, 871 F. Supp. 2d at 1100.

If the ITC were to grant injunctive relief, serious economic disruptions would occur, not only to Telit. *BASF* at *58 (injunction was against the public interest because it would lead to "market demand going unmet.").

Replacing modules is not a matter of simply swapping out one module for another. (Kelly Dec. ¶8). The design of products that use these modules would need to be changed; and, modules have to go through a series of regulatory and wireless carrier certifications, which is a process that can take up to 18 months. (*Id.*). The ITC's broad exclusionary remedies Philips seeks would leave many industries unable to build products with wireless communications capabilities for extended periods.

Telit recognizes Judge Andrews has stated that some "'federal courts outside of the Third Circuit have come to the conclusion that seeking injunctive relief against standard implementers is inconsistent with RAND or FRAND obligations' does not indicate the presence of some clear public policy that necessitates enjoining the UK action[.]" *TQ Delta, LLC v. ZyXEL Communs. Inc.*, 2018 U.S. Dist. LEXIS 98228 at *10-*11 (D. Del. 2018). However, the anti-suit injunction was directed to UK litigation. Judge Andrews stated: "The issue of comity is at the forefront of the Court's analysis." *Id.* at *6 and *7. Moreover, that decision did not consider French law; the patent owner did not ask the Court to determine a FRAND rate, as Philips has done here, and did not seek to continue license negotiations.

### 2.    ITC Exclusion Orders Would Effectively Divest this Court of Jurisdiction Over the FRAND Determination

Although the ITC action does not directly divest the Court of jurisdiction, it effectively makes the FRAND determination the parties seek in this court a nullity.

If the ITC were to issue an exclusion order, as a practical matter, there could be no objectively fair or reasonable license negotiation, or grant of a FRAND rate. Negotiation with a gun to your head, is no negotiation at all. *Microsoft*, 871 F. Supp. 2d at 1103 (a party with a choice of not selling or accepting a license "fundamentally places the party at a disadvantage.") And, a one-sided license entered because of an erroneously granted injunction cannot "be easily undone." *Id.* Moreover, an ITC injunction would "'interfere[] with 'equitable considerations,'" "'frustrate this court's ability to adjudicate issues properly before it,'" and create a "risk of inconsistent judgments. *Huawei Tech. Co. v. Samsung Elec. Co.*, 2018 WL 1794065 at *10 (N.D. Cal. 2018), vacated in an unopposed motion 2019 U.S. App. LEXIS 7649 (Fed. Cir. 2019) (citing *Microsoft,* 696 F.3d at 886 and *Microsoft*, 871 F. Supp. 2d at 1100).

## V.    CONCLUSION

The Court should enjoin Philips from litigating in the ITC.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

_____

OF COUNSEL:

David Loewenstein
Clyde Shuman
PEARL COHEN ZEDEK LATZER
   BARATZ LLP
1500 Broadway, Suite 12
New York, NY  10036
(656) 878-0800

February 15, 2021

Jack B. Blumenfeld (#1014)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Defendant Telit Wireless
Solutions, Inc.*

## **WORD COUNT CERTIFICATION**

The undersigned counsel hereby certifies that the foregoing document contains 4,967 words, which were counted by using the word count feature in Microsoft Word, in 14-point Times New Roman font.  The word count includes only the body of the motion.  The word count does not include the cover page, tables of contents and authorities, or the counsel blocks.


*/s/ Jack B. Blumenfeld*

_____

Jack B. Blumenfeld (#1014)

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 15, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on February 15, 2021, upon the following in the manner indicated:

| | |
|---|---|
| Adam Wyatt Poff, Esquire | *VIA ELECTRONIC MAIL* |
| Robert M. Vrana, Esquire | |
| Beth Ann Swadley, Esquire | |
| YOUNG, CONAWAY, STARGATT | |
| &amp; TAYLOR LLP | |
| Rodney Square | |
| 1000 North King Street | |
| Wilmington, DE  19801 | |
| *Attorneys for Plaintiff* | |
| | |
| Eley O. Thompson, Esquire | *VIA ELECTRONIC MAIL* |
| FOLEY &amp; LARDNER LLP | |
| 321 North Clark Street, Suite 2800 | |
| Chicago, IL  60654-5313 | |
| *Attorneys for Plaintiff* | |
| | |
| Kevin M. Littman, Esquire | *VIA ELECTRONIC MAIL* |
| Lucas I. Silva, Esquire | |
| FOLEY &amp; LARDNER LLP | |
| 111 Huntington Avenue, Suite 2500 | |
| Boston, MA  02199-7610 | |
| *Attorneys for Plaintiff* | |

Chad S.C. Stover, Esquire                         *VIA ELECTRONIC MAIL*
BARNES & THORNBURG LLP
1000 North West Street, Suite 1500
Wilmington, DE  19801
*Attorneys for Defendant CalAmp Corp.*


                                    */s/ Jack B. Blumenfeld*

                                    _____
                                    Jack B. Blumenfeld (#1014)