UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| KONINKLIJKE PHILIPS N.V., | |
| Plaintiff | C.A. No.:  20-01708 (CFC) |
| v. | REDACTED VERSION |
| TELIT WIRELESS SOLUTIONS, INC., TELIT COMMUNICATIONS PLC, | |
| Defendants. | |

**PHILIPS' STATEMENT CONCERNING HOW TO STREAMLINE AND EFFICIENTLY MANAGE THE CASE**

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| KONINKLIJKE PHILIPS N.V., | |
| Plaintiff | C.A. No.: 20-01708 (CFC) |
| v. | |
| TELIT WIRELESS SOLUTIONS, INC., TELIT COMMUNICATIONS PLC, | |
| Defendants. | |

**PHILIPS' STATEMENT CONCERNING HOW TO STREAMLINE AND EFFICIENTLY MANAGE THE CASE**

Pursuant to the Court's order at the March 16, 2022 Hearing (the "Hearing"), Plaintiff Koninklijke Philips N.V. ("Philips") hereby submits its proposal on how the Court should streamline and efficiently manage the case ("Philips' Proposal").[1]  At the Hearing, the Court informed the parties that it had determined to bifurcate the cases between liability and damages (Hr'g Tr. at 52:12-

---

[1] Philips proposed to Telit that the parties exchange their written proposals before submission to the Court so that full responses to each proposal could be incorporated (avoiding the need for later responses) or that both proposals from the parties could be submitted jointly, but Telit declined.  *See* Exhibit A, e-mail from E. Thompson to D. Lowenstein, dated May 6, 2022.

1

18), and so Philips' proposal is formulated with such directive in mind.  Philips

also makes its proposal in the spirit identified by the Court "to figure out a way to

try to streamline and efficiently manage the case towards a fair and just result" (*id.*

at 52:19-53:1).

### PHILIPS' PROPOSAL AND THE PROBLEMS WITH TELIT'S PROPOSAL (AS PHILIPS UNDERSTANDS IT[2])

**A.    PHILIPS' PROPOSAL**

Philips proposes that the Court conduct a first separate jury trial on the issue

of FRAND[3] that results in a FRAND award being entered by the Jury.  A second

trial on liability will only be needed if Telit in the meantime refuses to accept the

judicially approved FRAND amount.  This procedure has the highest likelihood of

efficiently resolving the heart of the dispute between the parties, which is whether

Philips offered FRAND licenses for the over 1100 patents in Philips' worldwide

portfolio.  Once approved by the Jury, the Jury can enter a FRAND award covering

the past and future.  Telit's proposal of handling the 1100 patents one-by-one is

inefficient and splinters the portfolio so that Philips must chase Telit around the

world country-by-country, patent-by patent.  *See* Philips' First Amended

Complaint (D.I. 64) at ¶25.

---

[2] *See* footnote 1, *supra*.

[3] "FRAND" refers to licenses on "fair, reasonable and non-discriminatory" terms, as described further below.

In the first trial, the Jury will consider whether the licensing offers by Philips to Telit on January 20, 2016, June 17, 2019 and November 5, 2019, for a license to Philips' worldwide portfolio of GSM/UMTS/LTE standard essential patents ("SEPs") ("Philips' SEP portfolio") were on FRAND terms,[4] as contemplated by Section 6.1 of the European Telecommunications Standards Institute's ("ETSI") Intellectual Property Rights ("IPR") Policy ("ETSI IPR Policy").[5] The question for the Jury is whether Philips complied with Section 6.1 and was "prepared to grant irrevocable licences on fair, reasonable and non-discriminatory ('FRAND') terms and conditions under such IPR to at least the following extent…." Ex. B at 41.  If Philips satisfied the requirement by offering FRAND rates, then the Jury should enter a verdict with a FRAND award matching Philips' compliance with the section. If the Jury decides that a FRAND rate was not already offered by Philips earlier, then the Jury could make a different FRAND award.  In any event, at the end of the

---

[4] For any Philips' offers of royalty rates, if those rates were determined to be FRAND, the rates could then be applied to past sales and would apply on an ongoing basis.  For any Philips lump sum offers, the jury could determine the effective royalty rates of the lump sum offers and apply those to past sales and also on an ongoing basis.

[5] A copy of Version 43 of the "ETSI Directives" is attached as Exhibit B. The ETSI Directives is a large document that includes a number of sub-sections. One of the sub-sections is the "ETSI Intellectual Property Rights Policy" ("ETSI IPR Policy"), which is Annex 6 to the "Rules of Procedure" and is found at pages 41-52.  *See* Ex. B at 41-52.  Another sub-section is the "Guide on Intellectual Property Rights (IPRs)," which is found at pages 57-68.  *Id.* at 57-78.

trial there would be a judicially sanctioned FRAND award for Telit to accept consistent with the ETSI policy, or Telit could reject this third-party benefit of the ETSI agreement, which would also simplify any further proceedings. *See, e.g.,* Restatement (Second) of Contracts § 306, at cmt. & illus. b (1981) (black letter law that a third party "beneficiary is entitled to reject a promised benefit...," and that when this occurs, the "effect on the promisor's duty to the beneficiary is the same as if no promise had been made."); French law is the same.

The Jury determination will resolve at least Count VIII of Philips' First Amended Complaint and has the best chance of resolving the overall worldwide dispute between Philips and Telit in the near term.  In order to maintain any third party benefits under the ETSI agreement, Telit must be unconditionally willing to accept a FRAND license. *See, e.g., Sisvel International S.A. v. Haier Deutschland GmbH*, Case No. KZR 35/17, Federal Court of Justice, ¶¶94-95 (Nov. 24, 2020) (Exhibit C) (a statement that it "would be prepared to take a FRAND license and pay royalties if German courts finally found infringement and invalidity" was a "conditional declaration of willingness" that was insufficient to be willing to license); *Sisvel International S.A. v. Haier Deutschland GmbH*, Case No. KZR 36/17, Federal Court of Justice (Bundesgerichtshof), ¶96 (May 5, 2020) (Exhibit D) ("[They] only made the declaration of willingness to license in conditional form. Such a declaration of willingness to license is insufficient."); *Nokia v. Daimler*, Case

4

No. 2 O 34/19, ¶161 (pp. 6-7), District Court of Manheim (Aug. 18, 2020) (Exhibit E) ("[A] conditional declaration of willingness to license is insufficient.").  Telit requires a license from Philips to make sales of its IoT modules and other devices that infringe the over 1100 patents in Philips' SEP Portfolio because, among other things, Telit's products practice ETSI standards which incorporate the technology in the patents in Philips' SEP Portfolio.  While only six of Philips' hundreds of SEPs are asserted in this particular case, Telit will ultimately have to enter a license to the full worldwide portfolio (as it already should have), or else it will be continuing to willfully infringe.

When the jury determines whether Philips has already offered a FRAND license, and enters a FRAND award, Telit should accept that finding and enter into a worldwide license at the Jury approved FRAND amount, covering both past and future infringement,[6] which should resolve the parties' dispute, unless Telit decides to decline the third-party benefits under the ETSI policy.  If Telit accepted the FRAND license as determined by the Jury at that time, there would be no need to address infringement, invalidity or enforceability of the particular six patents asserted in this action.  If Telit decides to decline the third-party benefit under the

---

[6] The parties could either agree in advance what the term of the license that is at the rate determined by the jury would be or the Court could set the time period, and the dispute be resolved for that period of time, potentially subject to later renewed licensing negotiations for a subsequent term.

ETSI policy, then the Jury and this Court may consider liability and appropriate remedies including entry of an injunction. *See, e.g.*, *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1332 (Fed. Cir. 2014) ("an injunction may be justified where an infringer unilaterally refuses a FRAND royalty").

Indeed, the parties have already engaged in extensive fact and expert discovery on the issues of whether Philips made FRAND licensing offers because they were relevant to the public interest issue in the International Trade Commission ("ITC") matter, *In the Matter of Certain UMTS and LTE Cellular Communication Modules and Products Containing the Same*, Inv. No. 337-TA-1240. There, after evaluating the extensive evidence at a Hearing in October 2021, the Administrative Law Judge ("ALJ") recently determined on April 15, 2022, in his Recommended Determination on Remedy and Bonding that ***all of the licensing offers that Philips made to Telit were FRAND***. *See* Ex. F[7] at 28 ("the evidence shows that Philips's offers to Telit … were all within a FRAND range"); *id.* at 30 ("Philips's numerous offers to Telit were all within a FRAND range, as Dr. Teece also explained."). In spite of the ALJ's determination, Telit continues to decline to accept the third-party benefits under the ETSI Policy including FRAND licenses

---

[7] A version of the Recommended Determination on Remedy and Bonding that has been jointly redacted by all the ITC parties is submitted under seal as Exhibit F because although it contains no Confidential Business Information, it has not yet been published by the ITC, with publication expected in the next few days.

offered by Philips.

To the extent Telit does not agree to a license at the FRAND award determined by the Jury in the first trial, the case would then proceed to a second trial on liability, but the issues in the second trial potentially would be limited by Telit's decision to reject third-party benefits under the ETSI Policy.

As a brief background concerning the proposed first trial, the FRAND licensing obligation derives from Section 6.1 of the ETSI IPR Policy, which provides that SEP owners are requested by ETSI to provide "an irrevocable undertaking in writing that it is prepared to grand irrevocable licenses on fair, reasonable and non-discriminatory ('FRAND') terms and conditions …." Ex. B at 41, Section 6.1. The ETSI IPR Policy provides a sample of what such an undertaking might look like in Appendix A to the ETSI IPR Policy. *See id.* at 48-50.

Philips provided a "general declaration" to ETSI back in January 15, 1998, stating in advance that it agreed to license all of its essential IPR on FRAND terms, in addition to later specific licensing declarations declaring its specific patents and patent applications, which included the patents-in-suit and the other patents in Philips' SEP Portfolio. As mentioned above, Philips has made multiple licensing offers to Telit over years of negotiations, all of which have been determined to be FRAND by the ALJ in the ITC, and none of which were accepted by Telit.

## B.    THE PROBLEMS WITH TELIT'S PROPOSAL (AS PHILIPS UNDERSTANDS IT[8])

While Philips has not seen Telit's written proposal yet, as mentioned in footnote 1, Philips understands from the hearing and talking with Telit's counsel that Telit is proposing that the Court have a first bench trial on unenforceability as a result of implied waiver.  Telit has thus far declined to speak to what will happen after its proposed bench trial.  Presumably, Telit would propose that the bench trial be followed by: (a) a second trial on liability including patent infringement and validity of each of the six patents, breach of contract issues, and whatever claims Telit raises when it answers the complaint, followed by (b) a third trial on FRAND, followed by (c), a trial on willfulness and enhanced damages.  Presumably, Telit will take the position that the FRAND trial will never happen, unless the first two trials result in verdicts in favor of Philips.  This would mean that the entire process of determining liability would need to be repeated for various sets of patents in Philips' portfolio of over 1100 patents until Telit finally agreed to a FRAND license.  That would be a massive waste of resources, but would certainly guarantee to delay a FRAND license to the maximum, as Telit held out paying the FRAND license that the ALJ found was offered to Telit on numerous occasions, with Telit declining time after time the third-party benefit under the ETSI

_____

[8] *See* footnote 1, *supra*.

agreement.

There are numerous problems, including many inefficiencies, with Telit's proposal(s).

### 1. Telit's Proposed First Bench Trial on Implied Waiver Does Not Resolve the Parties' Worldwide Dispute or Philips' Count VIII

First, Telit's proposal is inefficient because the first trial will not resolve the parties' worldwide dispute or Count VIII of the First Amended Complaint. Even if the Court were to determine that the six patents-in-suit are unenforceable based on the implied waiver doctrine, that would not affect the enforceability of the rest of Philips' SEP Portfolio including over 1100 patents, especially including all of Philips' foreign patents, to which the U.S. equitable defense of implied waiver does not apply. A finding that the six patents-in-suit are unenforceable would not change the need for Telit to license Philips' SEP Portfolio because this is a worldwide portfolio that Telit is infringing.

Similarly, Count VIII of Philips' First Amended Complaint seeks a declaratory judgment of "No Breach of FRAND and ETSI Commitments" (D.I. at p. 63) including "whether [Philips'] licensing offers were FRAND offers" (*id.* at ¶ 241). Consequently, a finding that the six patents-in-suit are unenforceable will also not resolve this specific declaratory judgment count (which is perhaps most reflective of the parties' overall dispute) because the worldwide nature of Philips'

SEP Portfolio means that to reach a determination on breach of contract, Philips' prior licensing offers should still be evaluated by a Jury to assess whether they were on FRAND terms in entering a FRAND award.

While findings of infringement and validity of the six patents-in-suit could be avoided in the unlikely event the six patents-in-suit are found unenforceable under the doctrine of implied waiver, in the broader context, having this first bench trial would not be an efficient approach because it would not resolve the worldwide or portfolio nature of the parties' dispute and Count VIII.  It would also drain judicial resources on an issue that does not go to the heart of the dispute between the parties.

### 2.    Telit's Proposed First Bench Trial on Implied Waiver Is Unlikely to Result in a Finding of Unenforceability

Because Telit will undoubtedly try to convince the Court in its proposal, as some type of inappropriate summary judgment-like argument, that the facts demonstrate a likelihood that Telit will succeed on its implied waiver defense, including based on the ALJ's Initial Determination in the ITC Investigation, Philips is forced here to respond, in advance of even an opportunity to assess what Telit plans to provide to the Court in its proposal, explaining at least some of the reasons why Telit is wrong.  Telit is unlikely to succeed on its implied waiver defense.

In general, waiver consists in the "intentional relinquishment or abandonment

of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).
Implied waiver can be established through "'a course of conduct'" even "absent
formal or express statements of waiver." *Berghuis v. Thompkins*, 560 U.S. 370, 383-
84 (2010) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).  In the
prototypical case of implied waiver, the relevant course of conduct signals an
intention to relinquish the right at issue.  But, "[a]s a general proposition, the law
can presume that an individual who, with a full understanding of his or her rights,
acts in a manner inconsistent with their exercise has made a deliberate choice to
relinquish the protection those rights afford." *Berghuis*, 560 U.S. at 385.

   In the context of divergent disclosure provisions in various standard setting
organizations, the Federal Circuit has stated that "[t]o support a finding of implied
waiver in the standard setting organization context, the accused must show by clear
and convincing evidence that '[the patentee's] conduct was ***so inconsistent with an***
***intent to enforce its rights*** as to induce a reasonable belief that such right has been
relinquished.'" *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1348
(Fed. Cir. 2011) (emphasis added) (quoting *Qualcomm Inc. v. Broadcom Corp.*,
548 F.3d 1004, 1020 (Fed. Cir. 2008)).  Courts consider whether there was a
breach of any disclosure duty, how much harm came from the breach, and whether
a remedy of unenforceability is an appropriate measure in relation to the harm from
the breach.  *Qualcomm, Inc.*, 548 F.3d at 1011-12.  The doctrine "should only be

applied in instances where the patentee's misconduct resulted in [an] unfair benefit" or alternatively, if the patentee engaged in sufficiently egregious conduct to justify waiver even without an inequitable benefit. *Core Wireless Licensing S.A.R.L. v. Apple Inc.*, 899 F.3d 1356, 1368 (Fed. Cir. 2018) (quoting *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011). The "equitable considerations require either a showing of prejudice or egregious misconduct sufficient to justify the sanction of unenforceability of the patent." *Id*.

Here, even without getting into the detailed facts that should be beyond this Proposal, Telit will not prevail on its implied waiver defense for numerous reasons.

First, Telit will be unable to prove that Philips received any unfair benefit based on disclosing its IPR to ETSI after the "freeze dates" of the relevant standards. 3GPP[9] and ETSI members are forbidden from considering IPRs in assessing whether to include technical proposals in the standards and instead only consider whether the best technical objectives are achieved. In the technical meetings relevant here (namely RAND), the participants understood well that all of the proposals likely included intellectual property rights. The directive simply was

---

[9] The Third Generation Partnership Project ("3GPP") is a separate organization from ETSI, but the ETSI standards are generally developed by 3GPP "working groups." After those working groups create standards or amendments to standards, they are brought to ETSI, which decides whether to incorporate the proposed changes into the standards, which is generally done.

to choose the best technology.  Consequently, whether IPRs are disclosed prior to or after a standard is adopted is irrelevant to whether the technology in the IPR becomes incorporated into a standard.[10]  In other words, there is no damages or benefit obtained in disclosing an IPR after a standard is adopted, instead of beforehand, because the consideration made by 3GPP working groups of whether a proposed technology becomes incorporated in the IPR is agnostic to whether there are IPRs covering such technology or not.[11]  This was analyzed and set forth in detail, for example, by the UK court in *Optis and Unwired Planet v. Apple*, Approved Judgment, [2021] EWHC 1739 (Pat) ("*Optis UK*") (attached as Ex. G), e.g., at [¶¶443-47] & [¶425(ii)].  Indeed, the ETSI Guide explicitly states that the language of Clause 4.1 "do[es] not mean that the window of opportunity to declare essential IPR is closed when a standard is adopted."  Ex. B at 72 (Clause 4.6.2.3).

Second, implied waiver does not apply to Telit because it is not a third party beneficiary to the relevant Clause of the ETSI IPR Policy that addresses

---

[10] *See, e.g.*, Ex. B at 41, Clause 3.1 (objective is to create standards that "best meet the technical objectives"); *id.* at 63,  ETSI Guide, § 2.3 ("Chairmen shall not allow any discussion on commercial issues in the Technical Body"), *id.* at 58, ETSI Guide, § 1 ("It is ETSI's objective to create Standards … that are based on solutions which best meet the technical objectives of ETSI").

[11] To the extent the expert, Dr. Michael Walker, in the *Core Wireless* case testified differently, without any expert offered by the plaintiff in that case to offer a different (correct) view, that will be irrelevant to this case.

disclosures of IPRs to ETSI, which is Clause 4.1.  Ex. B at 41, Clause 4.1.  That Telit is not a third party beneficiary to Clause 4.1 of the ETSI IPR Policy is clear from the language of the ETSI Guide itself, which specifies certain clauses to which third parties have third party beneficiary rights.  It states that implementers may be third party beneficiaries to Clause 6.1 (the licensing obligation), but intentionally omits Clause 4.1 (IPR disclosure) from the clauses of the ETSI IPR Policy to which implementers can be third party beneficiaries.  *See id.* at 59-60. No court has previously addressed this distinction between third party beneficiary rights to different clauses in the ETSI IPR Policy.[12]  Clause 4.1 is not made for the benefit of implementers, but rather only is an obligation by the SEP owner to ETSI, and neither French nor U.S. law considers such a relationship to give any rights to a third party. *See, e.g.,* Restatement (Second) of Contracts § 315 (1981) ("An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promise"); French law is the same.

The conduct and course of dealing of ETSI members over time also

---

[12] A third party can be a beneficiary to one clause of a contract but not others, under French law and U.S. law.  *See, e.g.*, *Republic of Iraq v. ABB AG*, 769 F. Supp. 2d 605, 612 (S.D.N.Y. 2011) ("the parties can obviously intend for a third party to benefit from certain promises in a contract and not others"); *BNP Paribas Mtg. Corp. v. Bank of America*, 778 F.Supp.2d 375, 415 (S.D.N.Y. 2011); ("Status as a third-party beneficiary does not imply standing to enforce every promise within a contract, including those not made for that party's benefit").

demonstrates that disclosure of IPRs before enactment of an ETSI standard is not required and was never the understanding of ETSI members. *See, e.g.,* Restatement (Second) of Contracts § 223 (1981) ("A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."); French law is the same. ETSI members have overwhelmingly disclosed IPRs only after the standards are already adopted. *See, e.g.*, Ex. H, Layne-Farrar, Anne, Assessing IPR Disclosure Within Standard Setting: an ICT Case Study, at 15 (Nov. 28, 2011) (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1912198) (finding that the great majority of ETSI IPR declarations were made after the standard was adopted, with only 11.3% made before the standard was adopted); *id.* at 18 (showing 94.4% of 2G IPRs declared ex post, 83% of 3G IPRs declared ex post, and 96.5% of 4G IPRs declared ex post); Ex. G, *Optis UK* at [¶429]; Ex. I, Brismark, Gustav, On the Timing of ETSI Disclosures (Dec. 17, 2021) (available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3988411) at 7 (showing, for 4G releases 8-14, 89-99% of IPR disclosures are after the standard was adopted). Indeed, for this reason, in *Optis Wireless Technology, LLC v. Apple, Inc.*, No. 19-CV-00066-JRG, at 24 n.6 (E.D. Tex. Jan. 22, 2021) ("*Optis E.D. Tex.*") (attached as Ex. J), a court found no breach of Clause 4.1 even though the IPR disclosure in

that case was made after the freeze date, including because "[t]he vast majority of ETSI participants disclose their intellectual property rights after both the Stage 3 and the TTCN freeze dates," with ETSI being aware of this disclosure practice and never having taken any action to encourage or enforce earlier disclosure.  *See* Ex. J, *Optis E.D. Tex.* at 24-25; *see also* Ex. G, *Optis UK*, at [¶528].  ETSI has never brought any action against any of its members for failure to disclose until after the freeze date, the implementation of the policy demonstrating the intent of the parties that disclosure after the freeze data is permissible.

The purpose of the ETSI IPR Policy is to make standards accessible and having available licenses – i.e., avoiding "patent ambush," which occurs when a SEP owner declares IPR essential yet refuses to agree to license the IPR on FRAND terms.  This purpose is satisfied by a SEP owner's declarations that it will license its IPRs (i.e., SEPs) on FRAND terms, and by the SEP owner's making FRAND offers, not by the SEP owner's timing of IPR disclosures to ETSI, which may explain why it has always overwhelmingly been the practice of ETSI members to submit IPR disclosures after standards are adopted.  The purpose of the ETSI IPR Policy is particularly served when a party files a "general declaration," which is a declaration stating that it will license all essential IPR on FRAND terms, which is made by the SEP owner even before it makes the later specific IPR disclosures that list specific patent applications and patents, as Philips

16

did here in 1998 before any of the relevant standards or patents occurred.

While Telit is attaching a copy of the Initial Determination of the ALJ in the ITC matter to this Proposal, in which the ALJ determined that the four patents in the ITC Investigation (which are different than the six patents-in-suit) were unenforceable under the implied waiver doctrine, the ALJ's Initial Determination should be given no value by this Court in its scheduling consideration. ITC determinations of patent invalidity and unenforceability "should not have a res judicata or collateral estoppel effect in cases before such [Federal District] courts." *See In re Convertible Rowing Exerciser Pat. Litig.*, 721 F. Supp. 596, 602 (D. Del. 1989) (quoting S. Rep. No. 1298, 93d Cong., 2d Sess. 196 (1974), 1974 U. S. Code Cong. & Admin. News 7186, 7329); *see also id.* at 604 ("This Court consequently holds that where the ITC makes a determination under section 337 of the Trade Reform Act of 1974 that a patent is invalid and is affirmed by the Federal Circuit, a federal District Court is not estopped from adjudicating the question of the validity of the same patent under its original and exclusive (as to the states) jurisdiction found in 28 U.S.C. § 1338 (1982)"). The Initial Determination has no precedential value as to unenforceability; it applies to different patents; and Philips is seeking review of it by the Commission. Furthermore, for the reasons expressed above and also many additional reasons, as set forth in Philips' Petition for Review (*see* Ex. K at 30-54), the ALJ's determination is seriously flawed. The ALJ failed to even address

most of Philips' arguments and ignored unrebutted evidence in the record in reaching its decision, often simply cutting-and-pasting portions of the respondents' briefs rather than providing its own analysis.  *Cf. Gechter v. Davidson*, 116 F.3d 1454, 1458 (Fed. Cir. 1997) ("a Board opinion must contain sufficient findings and reasoning to permit meaningful appellate scrutiny").

These are just a few of the reasons why Telit will be unlikely to prevail on its implied waiver unenforceability defense.  This shows that having a first bench trial on this equitable defense will be particularly inefficient.

### 3.    The Potential Repudiation Issue Weighs Against Telit's Proposal

While Telit is not a third party beneficiary to Clause 4.1 of the ETSI IPR Policy, as mentioned above, if Telit were to convince the Court that it is, based on being a third party beneficiary to Clause 6.1 (the commitment to be prepared to license on FRAND terms), then another issue that could be injected into a bench trial on implied waiver is whether Telit repudiated its third party beneficiary rights, including by rejecting the FRAND licensing offers made by Philips.  This issue concerning the potential effect of Philips' licensing offers, and whether they were FRAND, thus also suggests a first bench trial on implied waiver will not be efficient because of this subsidiary fact issue, which would be decided by a jury, not the Court.

### 4. The Relationship Between a Jury Trial Concerning Breach of Contract and a Bench Trial on Implied Waiver Could Be Improper

Another issue the Court should consider is whether a separate trial of a legal claim (Count VIII asserting no breach of contract) and an equitable claim (implied waiver defense) could be improper. *See, e.g., Celgene Corp. v. Barr Labs., Inc.*, No. 07-286, 2008 WL 2447354, at *2 (D.N.J. June 13, 2008) (two step analysis applied to whether trial of a legal claim may be bifurcated from an equitable claim: "First, the Court must determine whether the movant seeks to bifurcate the case such that resolution of an equitable claim precedes resolution of a legal claim. If this is the case, then the Court must determine whether the equitable and legal claims share common factual issues.") (applying *Shum v. Intel Corp.*, 499 F.3d 1272, 1277 (Fed. Cir. 2007)). As mentioned above concerning potential repudiation, there may be common factual issues, depending on how the Court decides whether and to what extent Telit has third party beneficiary rights. That could make it improper to have a bench trial on implied waiver prior to a jury trial on issues including breach of contract.

For all of the above reasons, Philips suggests that a first jury "FRAND trial" would the most efficient approach, while Telit's proposal of a first bench trial on the equitable doctrine of implied waiver would be inefficient.

                                        YOUNG CONAWAY STARGATT &
                                        TAYLOR, LLP

                                        */s/ Adam W. Poff*
                                        Adam W. Poff (No. 3990)
                                        Robert M. Vrana (No. 5666)
                                        1000 N. King Street
Of Counsel:                             Wilmington, DE 19801
                                        (302) 571-6600
Eley O. Thompson                        apoff@ycst.com
FOLEY & LARDNER LLP                     rvrana@ycst.com
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313                  *Attorneys for Plaintiff Koninklijke*
(312) 832-4359                          *Philips N.V.*
ethompson@foley.com

Kevin M. Littman
Lucas I. Silva
FOLEY & LARDNER LLP
111 Huntington Avenue
Suite 2500
Boston, MA 02199-7610
(617) 342-4000
klittman@foley.com
lsilva@foley.com

Dated:  May 9, 2022

29342776.1