IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KONINKLIJKE PHILIPS N.V., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 20-1708 (CFC) (CJB) |
| | ) | |
| TELIT IOT SOLUTIONS, INC. (f/k/a | ) | REDACTED - PUBLIC VERSION |
| TELIT WIRELESS SOLUTIONS, INC.); | ) | |
| TELIT COMMUNICATIONS LTD (f/k/a | ) | |
| TELIT COMMUNICATIONS PLC), | ) | |
| | ) | |
| Defendants. | ) | |

## TELIT'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF PATENT UNENFORCEABILITY

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Defendant Telit IoT
Solutions, Inc.*

OF COUNSEL:

David Loewenstein
Clyde Shuman
Kyle Auteri
PEARL COHEN ZEDEK LATZER
BARATZ LLP
7 Times Square, 19th Floor
New York, NY 10036
(656) 878-0800

**TABLE OF CONTENTS**

**Page**

I.   NATURE AND STAGE OF THE PROCEEDINGS......................................1

II.  SUMMARY OF THE ARGUMENT ...............................................................2

III. THE PARTIES AND THE ASSERTED PATENTS....................................8

    A.   Philips' Late Disclosure of the Asserted Patents ..................................8

    B.   Telit...........................................................................................................9

IV.  ETSI'S Rules AND PHILIPS' PARTICIPATION in standard setting .........9

    A.   ETSI Rule 4.1 ........................................................................................10

    B.   The ETSI Guide.....................................................................................12

    C.   Philips and the Named Inventors Were Involved in 3GPP Technical Meetings ...........................................................................................17

    D.   Philips Intentionally Waited Until *After* the Standards Were Enacted to Declare IPR to ETSI.......................................................................19

V.   ARGUMENT...............................................................................................22

    A.   Summary Judgment is Proper Here.......................................................24

    B.   Philips' Intentional Delay Renders the Asserted Patents Unenforceable ......................................................................................25

        1.   Reliance on Philips' Delay is not Required .............................27

        2.   Philips Inequitably Benefitted from its Delay .........................28

    C.   Telit is a Third-Party Beneficiary to ETSI's Rules..............................30

    D.   Philips' Experts' Opinions Cannot Change the Law ..........................30

VI.  CONCLUSION............................................................................................31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)....................................................................24

*Apple Inc. v. Motorola Mobility, Inc.*,
   886 F. Supp.2d 1061 (W.D. Wis. 2012)......................................*passim*

*Broadcom Corp. v. Qualcomm Inc.*,
   501 F.3d 297 (3rd Cir. 2007)..........................................3, 26, 27, 29

*Burnet v. Coronado Oil & Gas Co.*,
   285 U.S. 393 (1932) (Brandeis, J., dissenting)....................................4

*C.R. Bard, Inc. v. Medical Components, Inc.*,
   2023 WL 2064163 (Fed. Cir. 2023) .................................................23

*Core Wireless Licensing S.A.R.L. v. Apple Inc.*,
   899 F.3d 1356 (Fed. Cir. 2018) ..................................................*passim*

*HTC Corp. v. Ipcom GmbH*,
   2010 WL 11719073 (D. D.C. 2010)..................................................30

*Kimble v. Marvel Entm't, LLC*,
   576 U.S. 446 (2015).......................................................................4

*Microsoft Corp., v. i4i Ltd.*,
   564 U.S. 91 (2011) (Breyer, J. concurring) .......................................24

*Parklane Hosiery Co. v. Shore*,
   439 U.S. 322 (1979).......................................................................5

*Patterson v. McLean Credit Union*,
   491 U.S. 164 (1988).....................................................................23

*Qualcomm Inc., v. Broadcom Corp.*,
   548 F.3d 1004 (Fed. Cir. 2008) .............................................7, 26, 27

*Rivers v. Roadway Express*,
   511 U.S. 298 (1994).................................................................7, 30

*Texas Am. Oil Corp. v. United States Dep't of Energy,*
   44 F.3d 1557 (Fed. Cir. 1995) ................................................................5

**Treatises**

18 Moore's Federal Practice - Civil § 134.01 [1] (2021......................................4, 23

**Rules and Statutes**

28 U.S.C. § 1295(a)(6).............................................................................22

## I.   NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Koninklijke Philips N.V. ("Philips") brought two actions (C.A. Nos. 20-1708 and 20-1711) alleging Telit Wireless Solutions, Inc. (now, Telit IoT Solutions, Inc.) and Telit Communication PLC (now Telit Communications Ltd.) infringed 10 patents, four in 1711 and six in 1708-- all of which Philips claims are subject to mandatory FRAND (fair reasonable and non-discriminatory) license obligations.

On the same day, Philips filed an action in the International Trade Commission ("ITC") on the four patents asserted in the 1711 action. After a trial, the Administrative Law Judge ("ALJ") entered a Final Initial Determination ("FID"). (Ex. 1 at 266-84).   The ALJ held that Philips' asserted patents were unenforceable for the same reason raised here, and all asserted patents were not infringed and three of four were invalid.   On appeal, the ITC did not change the result (Ex. 2).

In this action, after the ITC decision, the Court adopted Telit's proposal to try patent unenforceability first and stayed the other issues. (D.I.79). Fact and expert discovery on that issue have closed.   A bench trial is scheduled for February 26, 2024.

## II.    SUMMARY OF THE ARGUMENT

The ***only way*** Philips can prevail is by asking the Court to ignore controlling

Federal Circuit precedent, *Core Wireless Licensing S.A.R.L. v. Apple Inc.*, 899 F.3d

1356, 1366 (Fed. Cir. 2018).  Philips also seeks to ignore the ALJ's lengthy decision

in the ITC, which followed *Core Wireless*.  In *Core Wireless*, the Federal Circuit

held the European Telecommunication Standards Institute's ("ETSI") Rule 4.1

required ETSI members participating in standard development to disclose their

patents and patent applications that are *or may become* essential *before* the standard

was adopted. *Core Wireless* held unambiguously (relying on former ETSI Chairman

Dr. Michael Walker) (at 1367-68; emphasis added throughout):

> [A]n ETSI member's *duty* to disclose a patent application
> on particular technology *attaches at the time of the
> proposal* and is not contingent on ETSI ultimately
> deciding to include that technology in an ETSI standard.
>
> ***
>
> Dr. Walker testified, however, that a disclosure under the
> ETSI policy was required to be made *no later than the date
> the standard was adopted*, which in this case was June
> 1998. Again, Core Wireless's reading of the policy, which
> would define a timely disclosure as one *occurring as late
> as four years after the adoption of the standard, is
> unsupported* in the record. As Dr. Walker's testimony
> made clear, *Core Wireless had a duty to disclose its IPR*
> [intellectual property rights] *no later than June 1998; its
> later disclosure was clearly untimely and not sufficient to
> cure the earlier breach of its duty.*"

Previously, in *Apple Inc. v. Motorola Mobility, Inc.,* 886 F. Supp.2d 1061,

1069 and 1087 (W.D. Wis. 2012), the Court agreed:

2

> "[I]t is generally understood that members of ETSI should disclose intellectual property rights that they know are relevant to potential standards *while the standard is being discussed and before the standard is adopted*."
>
> ***
>
> "Apple has proven that Motorola's membership in ETSI required Motorola to make reasonable efforts to disclose any intellectual property rights that might have become essential to standards being considered by ETSI *before those standards were adopted*…"

*Apple* at 1087.

Philips ignored ETSI's Rule. Instead, it filed patent applications, then the named inventors submitted proposals to technical committees, responsible for creating standards, the same subject matter in the pending applications; in some cases, the patent application and the technical submissions were separated by just a few days. In one instance, Philips included with the technical proposal the identical figure from a pending application. But Philips uniformly failed to tell anyone it had pending patent applications on the subject matter. The technical committees adopted Philips' proposals, and they became worldwide standards used by billions of people. Philips now sues, claiming its patents cover these standards.

These "standard essential patents" ("SEP") give their owners significant leverage in licensing negotiations and litigation because once the standard is adopted, and manufacturers incorporate it into their products, it is extremely difficult and costly to switch to an alternate technology. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 310 (3rd Cir. 2007). This enables SEP owners to make a "take it or

3

leave it" licensing demand and threaten sellers, years later, with a destructive injunction, and excessive licensing demands, as Philips has done.

The unfairness, which ETSI's rules were designed to avoid, is manifest because Philips has now sued on the standards it promoted, seeking an injunction to bar Telit's sales.

Philips' argument – really its only argument – is that the Federal Circuit's decision in *Core Wireless* is wrong; supposedly it was based on an "incomplete record." Philips' argument that the Federal Circuit would have come to a different conclusion had the District Court considered other evidence is speculation in its rawest form. Presumably, Philips also believes the ALJ's decision – in the forum Philips chose, based on a record Philips made – also was "incomplete," and wrongly decided. However, that do-over argument has been rejected:

> "Because of the great social utility of legal certainty and stability, the Supreme Court continues to repeat Justice Brandeis's famous words: "in most matters it is more important that the applicable rule of law be settled than that it be settled right." And the Court has observed that '[r]especting stare decisis means sticking to some wrong decisions.'"

18 Moore's *Federal Practice - Civil* § 134.01[1] (2021) quoting *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406 (1932) (Brandeis, J., dissenting), and *Kimble v. Marvel Entm't, LLC,* 576 U.S. 446, 455–456 (2015). Assuming *arguendo* that the Federal Circuit's decision is wrong, the Court is still bound to accept it as controlling

law.  Philips can appeal an adverse decision here and ask the Federal Circuit reverse itself *en banc*.[1]  But, the principle of *stare decisis* does not permit this Court to ignore Federal Circuit precedent.

More troublesome, Philips' argument could be made by any party on any issue: the appellate Court did not understand the evidence; it did not understand the law; the losing party should have presented more evidence; evidence could have been presented better; and the list goes on.  The mischief Philips' argument would create is itself a reason to reject it.  *Cf. Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 328 (1979) ("Permitting repeated litigation of the same issue as long as the supply of unrelated defendants holds out reflects either the aura of the gaming table or 'a lack of discipline and of disinterestedness on the part of the lower Courts, hardly a worthy or wise basis for fashioning rules of procedure.'")

The issue here is solely a matter of law. The following relevant facts are undisputed:

(i)     Philips filed patent applications naming its employees as inventors (SOF ¶¶11,14)[2];

---

[1]  *Texas Am. Oil Corp. v. United States Dep't of Energy,* 44 F.3d 1557, 1561 (Fed. Cir. 1995) ("This court applies the rule that earlier decisions prevail unless overruled by the court en banc ...")

[2]  "SOF" refers to the accompanying concise statement of facts.

(ii)   The named inventors then attended technical committee meetings where the relevant wireless communications standards were created (SOF ¶11);

(iii)   The named inventors made technical proposals and commented on other participants' proposals (SOF ¶14);

(iv)   Their proposals were eventually incorporated into the 3G and 4G wireless standards (SOF ¶14);

(v)   Philips did not disclose its IPR while the relevant standards were being developed (SOF ¶¶16,19);

(vi)   Philips intentionally waited until years after relevant standards had been adopted before declaring its IPR to ETSI as essential (SOF ¶¶23,25; Ex. 3, Tr. 251:17-253:9,261:5-262:3; Ex. 4, Tr. 101:3-8, 112:8-16); and

(vii)   Philips now bases its infringement allegations against Telit on parts of the standards that included the technical proposals its employees had promoted.  (SOF ¶17).

As the Federal Circuit and the ALJ held (on indistinguishable facts) – this behavior violated ETSI's Rule 4.1 requiring disclosure *before the standard is adopted.*

6

Philips also makes a series of "dog ate my homework" arguments (all rejected by the ALJ) that determining whether its IPR was/may become essential took time and effort; they were busy doing other things; they were understaffed, and it was not easy to do.[3] These are remarkable excuses for a company with 100,000 employees. (Ex. 1, at 281).

The Federal Circuit rejected the same argument in *Qualcomm Inc., v. Broadcom Corp.*, 548 F.3d 1004, 1019 (Fed. Cir. 2008), holding that if the patent owner was able to determine that its patents covered the standards, passing Rule 11 muster before bringing suit, it could have – and was required to – disclose its IPR before the standard was adopted.

Philips relies on a phalanx of experts who all say the same thing: this Court should ignore *Core Wireless*. However, as the ALJ held, "U.S. cases control enforceability of U.S. patents. See, e.g., *Rivers v. Roadway Express*, 511 U.S. 298, 312-13 (1994) ('It is this Court's responsibility to say what a statute means, and once the Court has spoken, it is the duty of other Courts to respect that understanding of the governing rule of law.'). Philips' French law expert's (or its German lawyer's [or Canadian or Finnish electrical engineers']) opinion cannot change that." (FID Ex. 1 at 284).

---

[3] Ex. 5, Q/A24-28; Ex. 1, at 281-282; Ex. 3, Tr. 252-253; Ex. 6, Tr. 75:25-76 :6.

## III.   THE PARTIES AND THE ASSERTED PATENTS

### A.   Philips' Late Disclosure of the Asserted Patents

Philips' "normal business practice" was to file patent applications on wireless communications standards, then send the named inventors to technical meetings to submit that subject matter as a proposed standard. (Ex. 6, Tr. at 39-42,88-89). That is what happened here. (SOF ¶16). Years after the standards containing Philips' proposals were adopted, Philips informed ETSI that it had IPR allegedly covering the standard.  (SOF ¶16).

The chart below shows the undisputed delays at issue. (SOF ¶19).[4]

| Patent Nos. | ETSI Publication Dates | Philips' Earliest ETSI Declaration | Delay from Publication Until Disclosure |
|---|---|---|---|
| '028 | April 25, 2001 (Philips' assertion) | Sep. 2, 2003 | at least 2 years, 4 months |
| '216 | May 5, 2000 (Philips' assertion) | Sep. 2, 2003 | at least 3 years, 3 months[5] |
| '929 | Jul. 7, 2005 | Nov. 26, 2009 | 4 years, 4 months |

---

[4]   See SOF ¶19; Philips does not dispute the dates the IPR was first declared to ETSI. (SOF ¶20).

[5]   Apparently, Philips agrees with these dates. However, using the correct publication dates for the '028 and '216 patents results in a longer delay, 3 years, 7 months for each (SOF ¶19n.1), but that is not material for this motion. The undisputed fact is that Philips declared all IPR *after* the standards were adopted.

8

| '814 | Mar. 9, 2007 | Nov. 26, 2009 | 2 years, 7 months |
|------|--------------|---------------|-------------------|
| '577/and '599 | Nov. 4, 2008 | Dec. 3, 2014 (for 4G) | 6 years |

**B.   Telit**

Telit IoT Solutions, Inc. is a U.S. sales company that sells wireless modules.

**IV.   ETSI'S RULES AND PHILIPS' PARTICIPATION IN STANDARD SETTING**

ETSI is associated with an organization called 3GPP (3rd Generation Partnership Project), which has technical committees that discuss various technology options, then select ones that ultimately become standards for the entire wireless industry worldwide. (SOF ¶2).

ETSI rules are contractual terms that bind ETSI members and are governed by French law.  (Ex. 7, ¶¶20-21).[6]

In 1992, shortly before the ETSI Rule at issue was enacted, the European Commission, whose communications ETSI is supposed to follow, issued the following statement (Ex. 7, ¶¶42-43):

> It should be stressed that, wherever possible, standards should be devised which *avoid taking over proprietary technology on which intellectual property rights already exist*. (§ 4.1.2).

---

[6] *Apple*, 886 F. Supp.2d at 1083-85.

9

In *Core Wireless* line of cases, Dr. Walker testified that "ETSI members are incentivized to choose technical solutions that are free of licensing costs." *Conversant,* 2019 WL 4038419 at \*6.

### A.   ETSI Rule 4.1

The ETSI Rule at issue states:

> [1] Subject to Clause 4.2 below, each MEMBER **shall** use its reasonable endeavours, **in particular during the development** of a STANDARD or TECHNICAL SPECIFICATION where it participates, *to inform ETSI of ESSENTIAL IPRs **in a timely fashion***.
>
> [2]   ***In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall***, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR ***which might be ESSENTIAL if that proposal is adopted***.
>
> 4.2   The obligations pursuant to Clause 4.1 above do however not imply any obligation on MEMBERS to conduct IPR searches.

The first clause of Rule 4.1 relates to members who participate in technical committees. (Ex. 7, ¶¶37,45). The second clause specifically states that members who *submit* technical proposals "*shall*" tell ETSI about the members' IPR – "which *might be* essential *if* that proposal is adopted." (Ex. 7 ¶37).

"IPR" is defined to include patent applications. (Ex. 8, Paragraph 15, clause 7, PDF 39. See also *Core Wireless*  at 1368; *Apple*, 886 F. Supp.2d at 1086).

Therefore, ETSI expected pending patent applications, like the ones at issue here, to be disclosed.

The Rule was modified at the behest of the European Commission in 2005. (Ex. 9, at Telit2021_017347 § 4.6). The second sentence was unchanged, but the first sentence was changed to add "in particular during the development of a STANDARD…" (SOF ¶8; Ex. 9, at Telit2021_017347 § 4.6). During the development of the standard can mean only one thing – before the standard is adopted, and further supports the view that IPR disclosure years after the standard was adopted is not compliant. The Court in *Apple* concluded (as did the Federal Circuit, and the ALJ (Ex. 1 at 269)).

> By using the terms 'might' and 'if,' the policy clearly requires members to make efforts to disclose intellectual property rights *before* a standard is adopted.

*Apple* at 1086 (emphasis in original).

The first clause of Rule 4.1 (which Philips seems to argue controls the analysis) states participants "shall use reasonable endeavors" to disclose IPR in a "timely fashion." However, as the ALJ found, Philips engaged in no endeavors to disclose its IPR before the standards were adopted, (Ex. 1 at 271). That is also the case here. Disclosing IPR years after the standards were adopted plainly is not a "timely fashion." As explained below, Philips delayed its disclosures until it suited Philips.

11

**B.**     **The ETSI Guide**

To help interpret ETSI's Rules and to give the technical committee Chairmen

guidance, ETSI published the Chairman's Guide in the 1990s (SOF ¶9).   At the

beginning of each meeting, the Chairman was required to make a "call" for IPR to

the participants.  (SOF ¶9).

ETSI's Chairman's Guide stated (Ex. 10, at KPNV0020640 §3.1.3):

> The objectives of the call for IPRs should be to
> (underline in original):
>
> remind the members and the person making the
> technical proposal of technical solution *about*
> *their obligation under Clause 4.1 of the Policy*
> *to draw ETSI's attention to any of their own IPRs*
> *which might be Essential to a Standard, if their*
> *proposed solution is adopted…*

This shows ETSI was sufficiently concerned about the existence of IPR that related

to the consideration of technical proposals to insist that *every meeting* start with a

reminder to the participants to disclose their IPR.

In 2004, the ETSI Guide on Intellectual Property Rights, which replaced the

Chairman's Guide, was published to help "understand and implement the Institute's

IPR Policy" (Ex. 11, at 48).  ETSI's 2004 Annual Report states:

> "Publication of the new ETSI Intellectual Property Rights
> (IPR) Guide, *which places special emphasis* on the
> *'timely disclosure of Essential IPRs*', together with the
> undertaking to grant license on FRAND (Fair, Reasonable
> And Non Discriminatory) terms and conditions."

12

(Ex. 12 at 9).

The ETSI Guide (§ 2.1.1) states (Ex. 9 at Telit2021_017338):

> Members participating in Technical Bodies should respond at the ***earliest possible time*** to the Call for IPRs performed by Technical Body Chairmen at the beginning of each meeting, based on the working knowledge of their participants.

> Furthermore, *the call for IPRs acts as a reminder of the member's obligations under the IPR Policy and is performed to foster the disclosure of Essential IPRs in a **timely fashion.***

> Members having IPR portfolios should ***improve their internal IPR co-ordination processes*** to ensure, as far as possible, that their participants in Technical Bodies are aware of any alleged-essential IPR the company may have (related to the on-going work on a particular ETSI Standard or Technical Specification), that they understand their obligations, and that they know how to discharge them.

> *Members are encouraged to* make general IPR undertakings/licensing declarations that they will make licenses available for all their IPRs under FRAND terms and conditions related to a specific standardization area and then*, **as soon as feasible***, provide (or refine) detailed disclosures. *This process reduces the risk of the standards making process being blocked due to IPR constraints*."[7]

---

[7] Philips argues that its general *licensing* declaration means it does not have to comply with Rule 4.1's obligation to make an *IPR* declaration. That is wrong. *Apple* at 1086 ("ETSI policies make clear that the submission of a general declaration does not relieve a member of its duty to make a timely declaration of specific patents and applications that it believes may be essential to an ETSI standard.")

In 2011, the European Commission communication stated (Ex. 13 at KPNV0044529 ¶286; EC's bold emphasis):

> Moreover, the IPR policy would need to require **good faith disclosure**, by participants, of their IPR that might be essential for the implementation of the standard under development. This would enable the industry to make an *informed choice* of technology and thereby assist in achieving the goal of effective access to the standard. …

Guide §4.6.3.4 echo's that sentiment: disclosure should be made "when that information might be most relevant to the development of a Standard of Technical Specification." (i.e., before the standard is adopted).  (Ex. 9, at 64).

Section 2 of the ETSI Guide, entitled "**Importance of timely disclosure of Essential IPRs,**" states:

> NOTE 2: The following description of Intentional Delay has been noted:
>
> > '*Intentional Delay*' has arisen when it can be demonstrated that an ETSI Member has *deliberately withheld IPR disclosures* significantly beyond what would be expected from normal considerations of 'Timeliness'.
> >
> > This description of 'Intentional Delay' should be interpreted in a way that is consistent with the current ETSI IPR Policy. In complying with the requirements of timeliness under Clause 4.1 of the IPR Policy, ***Members are recommended to make IPR disclosures at the earliest possible time*** following their becoming

14

aware of IPRs which are, or are likely to become, Essential.

NOTE 3: ***'Intentional Delay', where proven, should be treated as a breach of the IPR Policy*** (Clause 14 of the ETSI IPR Policy) and can be sanctioned by the General Assembly.

(Ex. 9, Telit2021_017338).

"Intentional non-disclosure" of SEP occurs "when a representative participating in a Technical Body on behalf of a Member has actual knowledge of EIPR [Essential IPR], and yet the Member holds back notification." (Ex. 9 at Telit2021_017349 § 4.6.3.2). As the European Commission explained, which was incorporated in the Guide:

> [T]he rationale behind the proposed deletion of "becomes aware of" is that we would expect a Member in a standard-setting process to have a *general awareness* of the scope of its IPR rights in that area, and therefore where necessary, 'use its reasonable endeavours' to identify these IPR.[1]
> > [Footnote 1] Once again, this is consistent with the notion of members being invited by the meeting Chairman to identify essential IPR at the beginning of each relevant meeting." (Ex. 9, Telit2021_017347 § 4.6.2.1).

The European Commission had already expressed that sentiment:

> In the event that the rightholder participates himself in the standard making body *it may be assumed that he receives constructive notice by the announcement that a standard is due to be established using the technology in question*. (Ex. 14, § 4.2.6.

15

These pronouncements state what is a matter of common sense, i.e., a named inventor knows his own IPR. Therefore, there can be no *genuine* factual dispute that the named inventors knew about their own pending patent applications when they made their technical proposals, which for some the patents included submissions made only a few days later. (SOF ¶15).

Despite its size and resources, and ETSI's admonitions, Philips did not have a simple database (i.e., an "internal IPR coordination process") that correlated patent applications to the named inventors' technical submissions to 3GPP. (Ex. 6, Tr. 35-39, 104-105).[8]  Moreover, Moulsley (one of the named inventors on all of the asserted patents) testified that Philips' "patent department would" have known "[i]f there was going to be a submission to 3GPP or something which was the subject of a patent application." (SOF ¶24).

Indeed, as the ALJ held:

> Philips's investigation of its own IPR should not have been difficult given [] the named inventors participated in the standard-setting activities and knew precisely what technical proposals were made. Indeed, Philips was obligated to have these resources.
>
> …Philips, with over 100,000 employees during the relevant time… certainly had the necessary personnel to

---

[8] When other companies wanted to track standards to amend claims of pending applications, to try to make the claims cover the evolving standard, they did it without a problem. (Ex. 15, Tr. 120:19-121:19; Ex. 16, Tr. 369:16-370:19). Philips plainly had the wherewithal to correlate patent applications and ETSI standards.

16

"search" its IPR which "might be ESSENTIAL if [a] proposal is adopted." *Philips made a business decision concerning the allocation of resources*.

(Ex. 1 at 281-2, citations omitted).

As explained in more detail below, the named inventors actively participated in technical committees; that is, they had "general awareness" of both the proposed standards and their IPR, and were on "constructive notice" that their IPR "might be" used. Nevertheless, Philips "withheld IPR disclosure."

## C. **Philips and the Named Inventors Were Involved in 3GPP Technical Meetings**

Either Moulsley or Baker, named inventors of the asserted patents, was the team leader of Philips' 3GPP standardization activities project. (SOF¶12). They were actively involved in 3GPP technical committees prior to the enactment of the standards at issue. (SOF ¶1). Moulsley worked at Philips from January 1984 to December 2008; he was a Philips consultant until 2023. (SOF ¶12)

The named inventors participated in the 3GPP technical group called RAN1 (Radio Access Network). (SOF ¶3). Moulsley and/or Baker attended every RAN1 meeting from 1999-2008. (SOF ¶13).

Before the named inventors proposed technical contributions to RAN1, or commented on other participant's proposals, Philips filed patent applications on the same subject matter that was submitted to RAN1. (SOF ¶14). Philips' proposals were incorporated in the 3G and 4G wireless standards. (SOF ¶14). Those

17

applications resulted in patents that Philips now alleges Telit infringes. (SOF ¶14). [9]
For example:

- Baker submitted a technical proposal to RAN1, which included a figure virtually identical to a figure in his application for the '814 patent, that had been filed less than a month earlier. (Ex. 17, ¶¶117,120-121). Then, four days after filing another application for the '814 patent, Baker presented a joint technical proposal referring to his earlier proposal; RAN1 adopted Baker's proposal as part of the standard, Philips now asserts that standard is covered by the '814 patent. (*Id.*, at ¶¶124-125).

- A few days after filing an application for the '216 patent, Moulsley submitted an equation to RAN1; Philips asserts that equation was included in the standard and now bases its infringement claim on this equation. (*Id.*, at ¶¶73,76-79).

- Less than a month after filing the final '028 application, Philips made three submissions to RAN1, each included a figure that was substantively the same as that application's Fig. 2 (and is also in the issued '028 patent). (*Id.*, at ¶¶39-40).

---

[9] The asserted patents are U.S. Patent Nos. 7,089,028, 8,195,216, 9,178,577, 9,635,599, 8,134,929, and 10,257,814. (SOF ¶10).

Philips' entire case against Telit is built on the allegedly infringing 3G and 4G standards that included Baker's and Moulsley's proposals. (SOF ¶18).

### D. Philips Intentionally Waited Until *After* the Standards Were Enacted to Declare IPR to ETSI

Kevin Scott, Philips' Licensing Program Leader, also prepared Philips' late 2003 IPR declaration, and was listed as the contact in Philips' late 2009 IPR declaration. (SOF ¶21). Scott also handled Baker's and Moulsley's patent applications. (SOF ¶22). The named inventors and Scott worked in the same building and frequently had lunch together, (Ex. 6, Tr. 32,250-51). They had no impediment to communicating information about IPR disclosures and technical submissions – if they wanted to.

Despite Philips' ability to make timely disclosures, Scott testified in the ITC that Philips intentionally did not declare patents as standard essential until *after* the standard had been enacted:

> "Q. … What did you mean when something is crystallized or Philips is in a position to declare?
>
> A. … When we're in a position to declare, we consider we've reached that position when we've either got a claim chart or a sufficiently good basis for knowing we can generate a claim chart.
>
> Q. What do you mean when you have a claim chart? When you have, what, an issued patent that reads on a standard?

19

A.  Yes.  So when we can perform a mapping either on an issued patent or on a patent application that is a clear enough match.

Q.  *So you're waiting until the standard is enacted before you do this matching*?

A.  We're waiting until we do this matching generally. So until someone gets round to doing the matching, because it's a non-trivial operation in the sense that patents and standards don't match themselves.  So *it needs some effort*, so it need[s] the *right people* to *have time to do it*.

Q. …  But the question is, *do you make any effort* to match your patents or your applications to anything before the standard is issued?

A.  Well, before the standard is issued it's not clear what the standard is."

(Ex. 3, 252-253).
\*\*\*

"A. *Until there is a standard either in a finalized or a draft form, there's nothing you can map against, so you can't do it.  Not possible*."

(*Id*., 262:1-3)

Gildas Bossard, Scott's successor (SOF ¶23), testified to the same effect:

"Q. Does Philips generally wait until a standard is released before it makes its ETSI declaration?

A. Yes. For the reason that we wait until the release for them, to be able to have the claim chart."

(Ex. 4, Tr. 101:3-8; see also *id*. 112:12-16).

Although ETSI requires "reasonable endeavors," Philips intentionally made *no* endeavor until it was too late. As the ALJ determined: "Philips made a business decision concerning the allocation of resources." (Ex. 1 at 282). Philips' behavior here was the same as that shown in the ITC.

Indeed, the head of Philips' Intellectual Property and Standards Group gave insight into Philips' strategy. ███████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████.

Philips' behavior is inconsistent with ETSI's Rules and with *Core Wireless*, where the Court held: "an IPR does not have to actually be essential to fall under the disclosure obligation 'so long as it might become essential, that's all that's required.'" *Core Wireless*, 899 F.3d at 1366. Therefore, waiting until the standard is "clear" is no excuse, nor is "need[ing] some effort" or not having the "right people to have time." Rather, as the ALJ held, these admissions are evidence of a "strategic decision to delay." (Ex. 1 at 272).

ETSI Guide §2 states that intentional delay is a breach of the rules (*supra*, at pgs. 15-16), which is what Scott admitted when he said Philips did not attempt to draft claim charts for the IPR declarations until well after the standards were adopted. (Ex. 3, 251:17-253:9, 261:5-262:3). Bossard concurred. (Ex. 4, Tr. 101:3-

8, 112:8-16).  The Court in *Apple*, 886 F. Supp.2d at 1085 (quoting ETSI Rules of

Procedure, No. 14, Ex. 9, PDF 38), determined:  "ETSI's policies state explicitly

that '[a]ny violation of the POLICY by a MEMBER shall be deemed to be a breach,

by that MEMBER, of its obligations to ETSI.'"  Philips' argument that only ETSI

can award a remedy for breach is inconsistent with *Apple* and Federal Circuit

authority cited.

Scott also admitted that Philips' licensing program (i.e., patent assertion) for

its 3G patents had "been dormant waiting for a significant market to develop." (SOF

¶25).  "[W]aiting" until a market develops – i.e., long after implementers around the

world have spent millions of dollars on research and development, and marketing

and the products have been sold to hundreds of millions of customers, violates ETSI

Rule, which are intended to prevent unnecessary expense and switching costs -- and

to avoid this type of gamesmanship.  "Waiting" is evidence that Philips made no

"reasonable endeavor to disclose its IPR in a 'timely fashion.'" (FID Ex. 1 at 271).

The undisputed facts demonstrate Philips deliberately delayed declaring its

IPR as essential, ignoring ETSI's Rules, while simultaneously seeking to benefit

from them. That is plainly inequitable.

## V.   ARGUMENT

Federal Circuit case law is dispositive.  28 U.S.C. § 1295(a)(6).  Moreover,

> "*[t]he doctrine of stare decisis is supported by principles
> that are central to American jurisprudence*. Thus, stare

> decis prevents the courts from deciding cases in an arbitrary way. It reflects the central idea that like cases should be treated alike. One recent district court decision explained that the doctrine of stare decisis 'is derived from considerations of stability and equal treatment.' Among the many reasons for adhering to stare decisis, the Supreme Court has emphasized that 'stare decisis is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.' … At the most practical level, 'no judicial system could do society's work if it eyed each issue afresh in every case that raised it.'"

Moore's at §134.01[1] (footnotes omitted); see also *C.R. Bard, Inc. v. Medical Components, Inc.*, 2023 WL 2064163 at *2 (Fed. Cir. 2023) ("We are bound by our precedent." Same issue on similar patents in prior case; same result as prior case).

The idea that a litigant can assert that a Court should disregard binding precedent based on its experts' arguments would lead to chaos. In *Patterson v. McLean Credit Union*, 491 U.S. 164, 172 (1988), the Supreme Court held:

> "*The Court has said often and with great emphasis that 'the doctrine of stare decisis is of fundamental importance to the rule of law*.' … [I]t is indisputable that stare decisis is a basic self-governing principle within the Judicial Branch, which is entrusted with the sensitive and difficult task of fashioning and preserving a jurisprudential system that is not based upon 'an arbitrary discretion.' ([S]tare decisis ensures that 'the law will not merely change erratically' and 'permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals')." (Citations omitted).

23

Here, Philips seeks to avoid Federal Circuit authority in *Core Wireless* by submitting contrary opinions from its experts.  But a party cannot assert that a Court should disregard binding precedent based on its experts' arguments.  See Section D, *infra*, and accompanying *Daubert* motion No.1.

### A.    Summary Judgment is Proper Here

There are no genuinely disputed issues of fact.  Philips declared its IPR as essential long after the standards were adopted, making this motion ideal to save the Court and the parties significant resources and costs.  There are no disputed facts to be tried.

Although "the judge must view the evidence presented through the prism of the substantive evidentiary burden" *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 254 (1986), "the evidentiary standard of proof applies to questions of fact and not to questions of law." *Microsoft Corp., v. i4i Ltd.*, 564 U.S. 91, 114 (2011) (Breyer, J. concurring).  Because the relevant underlying facts are undisputed, the evidence is clear and convincing; moreover, the legal conclusion necessitated by those facts is unaffected by the evidentiary standard. *Id*. ("Where the ultimate question of patent validity turns on the correct answer to legal questions—what these subsidiary legal

standards mean or how they apply to the facts as given—today's strict standard of proof [clear and convincing evidence] has no application.")

There is no factual dispute that Philips participated in the standard setting committees, that Philips made technical proposals and commented on others, and Philips had pending applications associated with their proposals and comments (see SOF ¶¶11,13-16). And there is no *genuine* factual dispute that Philips disclosed its IPR to ETSI at least 2 to 6 years *after* the relevant standard was adopted. (SOF ¶¶19-20).

There is no dispute from Philips' myriad of experts that Philips disclosed the asserted patents after the standards were adopted. Philips' other arguments are irrelevant. For example, Philips' argument that others also declared IPR after the standard was enacted ignores Rule 4.1, *Core Wireless* and other decisions. It is an attempt to impose an untenable "two wrongs make a right" standard: others declare late, so Philips can too.

### B. Philips' Intentional Delay Renders the Asserted Patents Unenforceable

Participants in standard setting organizations ("SSO") may waive their rights to enforce patents against products that practice the standard. *Core Wireless*, 899

F.3d at 1365.  Waiver exists where the patentee (1) had a duty to disclose to the SSO, and (2) breached that duty.  *Id*.

As *Core Wireless* makes plain, and as ALJ held, both elements exist here. Philips unquestionably had a duty to disclose its IPR before the standard was adopted.  Element two exists too. Philips beached that duty.  In *Qualcomm Inc. v. Broadcom Corp.,* the Federal Circuit "affirm[ed] the district court's determinations that Qualcomm had a duty to disclose the asserted patents to the JVT [SSO], [and] that it breached this duty …"  The language requiring disclosure in the JVT SSO ("reasonably *might be necessary* to practice the [] standard") is nearly identical to the ETSI's ("*might be ESSENTIAL* if that proposal is adopted.").  Just as there was a duty to disclose in *Qualcomm*, *Core Wireless, Apple* and the ITC proceeding – there was one here too.[10]

Further, Philips cannot say that it did not know (because it intentionally did not investigate) that its IPR "might" cover the standards and sue on those same standards now.  The *Qualcomm* Court addressed this incongruity (548 F.3d at 1019):

> Broadcom argues that if Qualcomm truly believes that the asserted patents do not meet the 'reasonably might be necessary' standard, then it necessarily lacked a Rule 11 basis to bring this litigation in the first place. … We are not persuaded by Qualcomm's arguments on this point, and are unable to reconcile its ex post argument that the

---

[10]  Philips will cite an unreported Texas decision, *Optis v. Apple* (2:19-cv-00066-JRG), but that case also held: "ETSI Policy imposes a duty to disclose IPR in Clause 4.1." (At 22).

> asserted patents do not meet the 'reasonably might be necessary' standard with its ex ante arguments regarding infringement. Based on the foregoing, we conclude that the district court did not err in finding clear and convincing evidence that the [asserted] Patents fell within the 'reasonably might be necessary' standard.

If Philips believes now that the patents cover the standards, it should have disclosed its IPR before the standards were adopted. Any other result plainly is inequitable. As the Federal Circuit held in *Qualcomm* (548 F.3d at 1021-21):

> [A]fter participating in the [SSO] and shielding the asserted patents from consideration during development of the [ ] standard, Qualcomm filed a patent infringement lawsuit against Broadcom, alleging infringement primarily, if not solely, based on Broadcom's [standard] compliance. In these circumstances, we conclude that it was within the district court's authority, sitting as a court of equity, to determine that Qualcomm's misconduct falls within the doctrine of waiver.

*See also Conversant*, 2019 WL 4038419 at \*5-\*7; *Core Wireless*, 899 F.3d at 1368 ("Implied waiver is an equitable doctrine, and an 'equitable doctrine "hinges on basic fairness"'").

### 1. Reliance on Philips' Delay is not Required

The *Qualcomm* Court also rejected the argument that the accused infringer must show reliance on the patent owner's misconduct to prove unenforceability (548 F.3d at 1022):

> [I]t would be improper to allow Qualcomm to rely on the effect of its misconduct to shield it from the application of the equitable defense of implied waiver.[8]

27

> 8 [T]he district court's findings in this case as to
> Qualcomm's intentional nondisclosure in the
> face of a duty to speak fully support the
> application of implied waiver.

*Core Wireless* (at 1367) reached the same conclusion: "[T]here is no requirement

under the implied waiver doctrine that a third party must interpret the patentee's

conduct as constituting a waiver of its rights to enforce the patent[.]"

### 2. Philips Inequitably Benefitted from its Delay

As the Court in *Conversant* held (2019 WL 4038419 at \*14-15), IPR owners

inequitably benefit from their late disclosures:

> Nokia [the original patent owner] and Conversant have
> obtained such an unfair competitive advantage. The '151
> patent became standards-essential when ETSI
> incorporated the method into the GPRS standard, allowing
> Conversant to extract licenses from industry participants.
> … And Nokia's patent licensing offer to Apple states that
> its essential patent families, which includes the '151
> patent, commands substantial royalties. [] This undeserved
> competitive advantage is further bolstered by the fact that
> the '151 patent is essential. *Cf. Core Wireless*, 899 F.3d at
> 1367 ("[T]here is no ground for dispute that Nokia's
> proposal, if adopted, would have made [the '151] patent
> standards-essential."). [] "[S]tandards-essential patents
> cannot be 'designed around' and must be licensed by
> anyone using the standard."
>
>                                    \*\*\*
>
> Conversant asserts that Apple has not met their burden
> because they failed to connect their nondisclosure with the
> inequitable benefit. ***Such but-for proof, however, is not
> required***. Nokia's failure to disclose its IPR deprived
> ETSI members the opportunity to make a fully informed
> decision as to the technical solution for the GPRS

28

> standard. Nokia and Conversant cannot now "rely on the
> effects of its misconduct to shield it from the application
> of the equitable defense of implied waiver."

*Accord, Broadcom* 501 F.3d at 314 ("That value [of a patent] become significantly

enhanced, however, after the patent is incorporated in a standard."); *Conversant*,

2019 WL 4038419, at *6 (Offering FRAND licenses "is beside the point. The issue

is whether [the patent owner] should have been able to request a license at all ….

[D]eclaring patents as standard essential "increase[ed] [the patent owner's] leverage

by bolstering its patent portfolio"). The ALJ agreed: "Philips's deliberate non-

disclosure, like Nokia's in *Conversant*, demonstrates inequitable benefit." (Ex. 1 at

281):

The facts in *Apple v. Motorola* closely mirror those here. Motorola filed a

complaint in the ITC and in District Court. Apple counterclaimed, including for

Motorola's breach of its ETSI obligation by not declaring three asserted patents to

ETSI until after the relevant standards were enacted. *Apple*, 886 F. Supp.2d at 1070-

71 and 1087. Like here, the named inventors were involved in technical committees.

The Court granted Apple's motion for summary judgment that established the

elements of breach of contract, applying French law (at 1081), that:

> Motorola received the benefit of participating in the
> standards development process and influencing the choice
> of technology for the standards.

*Apple*, 886 F. Supp.2d at 1084.

**C.**  **Telit is a Third-Party Beneficiary to ETSI's Rules**

The *Apple* Court expressly held (886 F. Supp.2d at 1088 (also 1085)):

> Apple is a third-party beneficiary of Motorola's
> contractual obligations to ETSI and IEEE.

The ALJ agreed.  (Ex. 1 at 283-84).  Likewise, the Court in *Core Wireless* would

have had no reason to address the merits of the late disclosure unless Apple was a

third-party beneficiary and had standing to assert the defense.  In *Conversant*, 2019

WL 4038419 at \*6-7, the Court held the patent unenforceable, and would not have

done so unless Apple had been a third-party beneficiary.

**D.**  **Philips' Experts' Opinions Cannot Change the Law**

Philips' experts argue there is no such thing as late disclosure, and that IPR

disclosure can be made at "any time."   As Telit explains in its accompanying

*Daubert* motion No. 1, Philips' experts cannot change binding Federal Circuit

precedent. Huber is a German lawyer, whose views on French law and U.S. law are

irrelevant.  Although Borghetti is a French lawyer, he cannot change Federal Circuit

precedent. Philips' other experts are not experts on any law.  None of them can

change Federal Circuit law relating to the enforceability of *U.S.* patents.  *See, e.g.*,

Ex. 1 at 284 *citing Rivers*, 511 U.S. at 312–13; see also, *HTC Corp. v. Ipcom GmbH*,

2010 WL 11719073 at \*6 (D. D.C. 2010).

## VI.    <u>CONCLUSION</u>

Telit's motion should be granted, and the asserted patents should be declared

unenforceable when applied to the accused standards.


MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Anthony D. Raucci*

OF COUNSEL:

David Loewenstein
Clyde Shuman
Kyle Auteri
PEARL COHEN ZEDEK LATZER
BARATZ LLP
7 Times Square, 19th Floor
New York, NY  10036
(656) 878-0800

August 23, 2023

Jack B. Blumenfeld (#1014)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Defendant Telit IoT
Solutions, Inc.*

## CERTIFICATION REGARDING WORD COUNT AND FONT SIZE

This brief complies with the type and word limitation in Paragraph 10 of the Scheduling Order (D.I. 82) because it is written in 14-point Times New Roman font and contains 6,750 words according to the word count feature of Microsoft Word, and collectively with the briefing on the Daubert motions filed herewith, does not exceed the 12,500 word limit set forth in the Scheduling Order.

August 23, 2023

*/s/ Anthony D. Raucci*

_____

Anthony D. Raucci (#5948)

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on August 23, 2023, upon the following in the manner indicated:

Adam Wyatt Poff, Esquire                    *VIA ELECTRONIC FILING*
Robert M. Vrana, Esquire
Alexis N. Stombaugh, Esquire
YOUNG, CONAWAY, STARGATT
  & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE  19808
*Attorneys for Plaintiff*

Eley O. Thompson, Esquire                   *VIA ELECTRONIC FILING*
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL  60654-5313
*Attorneys for Plaintiff*

Kevin M. Littman, Esquire                   *VIA ELECTRONIC FILING*
Lucas I. Silva, Esquire
FOLEY & LARDNER LLP
111 Huntington Avenue, Suite 2500
Boston, MA  02199-7610
*Attorneys for Plaintiff*


                                    */s/ Anthony D. Raucci*
                                    _____
                                    Anthony D. Raucci (#5948)